**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re** | ) | **Chapter 11** |
| | ) | |
| **LITTLEFORD DAY, INC.**[1] | ) | |
| | ) | **Case No. 15-10722** |
| | ) | |
| **Debtor.** | ) | |
| | ) | |

**FIRST DAY DECLARATION OF J. GARVIN WARDEN, CHIEF RESTRUCTURING**
**OFFICER OF LITTLEFORD DAY, INC.**

Pursuant to 28 U.S.C. § 1746, I, J. Garvin Warden, hereby declare as follows under the

penalty of perjury:

1.      I am the chief restructuring officer of Littleford Day, Inc. ("Littleford," "Debtor"

or "Company"), a corporation organized under the laws of the state of Delaware.  I have worked

with the Debtor since December 2014.

2.      I am authorized to submit this declaration in support of the Debtor's chapter 11

petition and the first day motions and proposed orders described herein (the "First Day Motions

and Orders").  I am familiar with the Debtor's day-to-day operations, business affairs, and books

and records.  I have also reviewed the Debtor's First Day Motions and Orders and am familiar

with the facts alleged and relief requested therein.  I have personal knowledge of the facts,

circumstances, and other matters set forth in the First Day Motions and Orders and in this

declaration, or have gained knowledge of such matters from the Debtor's officers, employees, or

retained advisers that report to me in the ordinary course of my responsibilities as Chief

Restructuring Officer.  I am over the age of 18 and authorized by the Debtor's Board of Directors

---

[1] The last four digits of Debtor's taxpayer identification number are 7511.  Debtor's corporate headquarters are
located at 7451 Empire Drive, Florence, Kentucky 41042.

to submit this declaration on behalf of the Debtor.  If called as a witness, I could and would competently testify to the facts set forth in this First Day Declaration.

3.    On April 2, 2015 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.

4.    The Debtor continues to operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.    No trustee or examiner has been appointed in this chapter 11 case and no committee has been appointed or designated.

A. **The Debtor**

6.    Littleford is a manufacturer of custom-made process equipment (including mixers, dryers and granulators), which have a variety of applications for companies in a broad range of industries, including, without limitation, food and beverage, pharmaceutical, nutraceutical, plastic and chemical, and automotive.  Littleford also maintains a parts business and provides technical guidance, maintenance and advisory assistance to its customers. The Company has been in business since 1882.

7.    Littleford's facility is located in Florence, Kentucky.   While the Company employed as many as sixty-five (65) individuals within the past year, due to substantial financial challenges, Littleford has had to reduce its labor force to twenty-seven (27) employees as of the Petition Date.

8.    Littleford is a small company with significant operational costs.  As of February 28, 2015, Littleford has had approximately $1 million in gross sales and has experienced a dramatic decline in order rate since the end of 2014.  Within the past few years, Littleford's sales have been relatively flat in an environmental of rising costs, which in turn has largely reduced its

profit margins. Despite good faith efforts to reduce costs and enhance revenue, the Company simply has been unable to maintain adequate cash flow to satisfy its mounting obligations

9.      Littleford is party to a collective bargaining agreement ("CBA") with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW) AFL-CIO, CLC on behalf of Local 8-0757.  Littleford also sponsors the Littleford Day, Inc. Retirement Plan, a defined benefit plan for its union and salaried employees (the "Pension Plan").  The Pension Plan is currently frozen and underfunded. Littleford is unable to sustain the Pension Plan.

10.      Prior to the Petition Date, Littleford explored a variety of restructuring options. The Company employed a variety of measures to minimize its carrying costs while it explored its options, including the possibility of a sale.  Ultimately, the Company decided it would attempt to effectuate a sale that would preserve its enterprise value and best serve the interests of Littleford's creditors, its employees, and its valued customers.

**B.  The Debtor's Pre-petition Restructuring, Marketing and Sales Efforts**

11.      Since the beginning of 2015, I have assisted the Debtor as it explored sale and restructuring opportunities involving certain competitors/prospective buyers within the Debtor's industry.   Interested parties conducted due diligence.

12.      I have assisted the Debtor in its solicitation and receipt of letters of intent from interested parties via a limited confidential auction process.  Based upon my discussions with prospective buyers, I have concluded that no prospective buyer seems willing to acquire the equity of the Debtor or otherwise assume its liabilities; instead, interested parties have informed me that they require an asset sale, free and clear of claims, liens and encumbrances in order to consummate a transaction. Taking into account the expressed conditions precedent to a sale

transaction, coupled with a looming liquidity crisis, mounting pressure from trade creditors and significant legacy costs, the Debtor decided to pursue a sale process that would be implemented through the filing of a bankruptcy case under chapter 11 of the Bankruptcy Code.

13.     After considering multiple proposals, the Debtor, in an exercise of its reasoned and sound business judgment, designated Loedige Littleford Process Technology, LLC ("LLPT" or "Buyer") to be a stalking horse bidder in furtherance of its bankruptcy sale process upon terms and conditions discussed in greater detail below.  I believe that such a decision is in the best interests of the Debtor, its creditors and other parties in interest.   Notably, S-Two, LLC owns approximately 25% of LLPT.  Two of the forty-six shareholders of the Debtor (who in the aggregate hold less than 15% of the shares in the Debtor) are members of S-Two, LLC.  I understand that no other persons or parties related to the Debtor are affiliated with the LLPT.

14.     I have assisted the Debtor in the development of a list of approximately 200 prospective buyers whom we will be contacting throughout the sale process, which companies were identified by researching the Debtor's contact lists and databases, various trade organization membership lists and other relevant sources.[2]  Due to the small size of the proposed transaction and the Debtor's business, the Debtor has not retained an investment banker to market its assets nor does it intend to retain such a professional.

## C. The Need for Financing

15.     In order to pursue a sale process in this case that preserves the enterprise value of the Company, the Debtor requires post-petition financing. The Debtor has an immediate and critical need to obtain post-petition financing and to use cash collateral in order to advance its restructuring efforts and/or to sell certain of the Debtor's assets.  I believe the Debtor does not have sufficient available sources of working capital to operate its businesses in the ordinary

---

[2] A brief summary of Mr. Warden's background is attached hereto as Exhibit "A".

course of its business without the post-petition financing. The Debtor's ability to maintain

business relationships with its vendors, suppliers and customers, to pay its employees, and to

otherwise fund its operations is essential to the Debtor's continued viability as the Debtor seeks

to maximize the value of the assets of the bankruptcy estate for the benefit of all creditors of the

Debtor.

16.     Prior to the Petition Date, the Debtor maintained a line of credit with MainSource

Bank, the successor-in-interest to The Merchants Bank and Trust Company. The amount owed

to MainSource Bank was $1,922,746.48 (the "Pre-Petition Secured Claim"). The Debtor had no

availability under the MainSource line of credit and was therefore operating exclusively from

available cash collateral. The Debtor was struggling with its various business and operational

payment obligations and was unable to make payments to creditors as they came due.

17.     The Pre-Petition Secured Claim was secured by substantially all of the Debtor's

assets, including, without limitation marketable securities.

18.     I approached approximately 20 lenders seeking debtor-in-possession financing.

Despite my good faith effort, none of the lenders approached were willing to provide the Debtor

with the financing it would need to advance its restructuring efforts within a chapter 11

bankruptcy case on terms and conditions as favorable as LLPT.

19.     I then approached the entities who expressed an interest in purchasing the

Debtor's assets about the prospect of providing debtor-in-possession financing. Ultimately, in

connection with its purchase offer, LLPT agreed to provide the Debtor with financing provided it

received a variety of protections, including, but not limited to, a superpriority claim and a first

lien against all assets (as set forth in the DIP Loan Documents (used hereinafter as defined in the

Debtor's debtor-in-possession financing motion (the "DIP Financing Motion")).

20.     On March 23, 2015, in order to avoid a potentially costly and detrimental priming fight in connection with a relatively small debtor-in-possession financing facility, the Debtor allowed for the liquidation of $1,876,952.60 in marketable securities and then paid $45,793.88 to MainSource in cash in order to pay off the Pre-Petition Secured Claim. As of the Petition Date, the line of credit remains closed and the Debtor has no credit available to it other than the proposed post-petition debt facility.

### D.  The Willing Lender

21.     LLPT advised me of its willingness to extend certain loans, advances and other financial accommodations on the terms and conditions set forth in the DIP Loan Documents.

22.     As set forth in greater detail in the DIP Financing Motion and the DIP Loan Documents, the amount of the DIP financing facility is up to $750,000 (the "DIP Financing Facility"), with an interim need of approximately $330,000 (based on projected need through the week of May 17, 2015). The interest rate is at 3.5% per annum and there is a facility fee of $15,000.

23.     I do not believe the Debtor is presently able to procure financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code, as an administrative expense under Section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to Section 364(c)(1), 364(c)(2) or 364(c)(3) of the Bankruptcy Code, without the grant of liens on assets (including, if applicable, a lien granted pursuant to Section 364(d)(1). The Debtor has been unable to procure the necessary financing on terms more favorable taken as a whole, than the financing offered by LLPT pursuant to the DIP Loan Documents.

24.     The Debtor, in what I believe to be an exercise of its prudent business judgment, has concluded that the terms of the DIP Loan Documents are fair, just and reasonable under the circumstances, are ordinary and appropriate for secured financing to a debtor-in-possession, and are supported by reasonably equivalent value and fair consideration and I concur with that assessment based on the facts and circumstances surrounding this matter.  I believe that the proposed financing represents the best financing presently available to the Debtor

25.     The terms and conditions of the DIP Loan Documents have been negotiated in good faith and at arms' length by and between the Debtor, on one hand, and Lender on the other hand, with all parties being represented by counsel.

26.     The DIP Financing Facility is absolutely critical to the continuation of the continued viability of the Debtor, the continued sale process and the preservation of value for creditors, parties in interest and other stakeholders.

**E.  The Potential Sale**

27.     As stated above, the Debtor has designated LLPT as the stalking horse bidder, subject to Bankruptcy Court approval.

28.     On April 2, 2015, the Debtor and LLPT entered into an agreement (the "Asset Purchase Agreement") wherein LLPT will acquire substantially all of Littleford's assets (other than excluded assets), free and clear of all liens, claims and encumbrances.  Among other things delineated in the Asset Purchase Agreement, the Debtor's cash, accounts receivable and avoidance actions are excluded from the sale and shall remain with the Debtor and its bankruptcy estate.

29.     The negotiation of the Asset Purchase Agreement was extensive and at times contentious.[3] The Asset Purchase Agreement was negotiated, proposed and entered into in good faith and from arms-length bargaining positions.

30.     As set forth in greater detail in the Asset Purchase Agreement, the purchase price for Littleford's assets is One Million Seven Hundred and Fifty Thousand Dollars ($1,750,000), subject to certain adjustments described therein (the "Purchase Price") and the assumption of certain liabilities (together with the Purchase Price is hereinafter referred to as the "Stalking Horse Bid").

31.     The Asset Purchase Agreement provides for the creation of an escrow in the amount of $300,000 to address claims that might arise post-closing pursuant to a limited indemnity provision, subject to categorical caps.

32.     In connection with the Asset Purchase Agreement and the Stalking Horse Bid, the Debtor is going to file a motion wherein it seeks approval of the following bidding protections:

a.      As set forth in greater detail in the Asset Purchase Agreement, Littleford agrees to pay the Stalking Horse Bidder a break-up fee in the amount of $75,000 if (i) Littleford enters into and closes an Alternative Transaction[4] or (ii) Littleford breaches certain provisions of the Asset Purchase Agreement (the "Break-up Fee").

b.      The Break-up Fee shall be paid, if an Alternative Transaction closes, at the time of and from the proceeds of such closing. If no Alternative Transaction closes, the Break-up Fee will be allowed in full as an administrative expense and paid at the same time as other administrative expense claims are paid in the Bankruptcy Case without further order or approval of the Court.

33.     Based on my experience with transactions of this size and in consideration of the facts and circumstances surrounding this Debtor and this case, the proposed bidding protections,

---

[3] Neither S-Two, LLC nor the members of S-Two, LLC participated in the negotiations of the Asset Purchase Agreement with the Debtor.
[4] Used as defined in the Asset Purchase Agreement.

as set forth in greater detail in the sale/sale procedures motion, are fair reasonable and appropriate.

34.    The Debtor intends to run a sale process that will commence shortly after the commencement of the Bankruptcy Case.  Due to the Debtor's strained cash position, I believe the Debtor will need to advance the sale process expeditiously.  The Debtor will file a motion seeking, among other things, approval of the Asset Purchase Agreement and establishment of bidding procedures by April 6, 2015. The Debtor is requesting that the Bankruptcy Court enter an Order approving the bidding procedures by no later than ten (10) days thereafter in a form, substance and manner required in the Asset Purchase Agreement.  The Debtor intends to hold an auction approximately sixty (60) days following the Petition Date and will seek entry of an Order approving the sale by no later than June 8, 2015.  The Debtor anticipates closing on the sale within five (5) days of entry of the sale order, thereby concluding the sale process between 70 and 75 days following the Petition Date.

35.    Failure to effectuate a sale within the aforementioned proposed timeframe will likely result in the deterioration of the value of the Debtor's assets as there is a substantial risk that the Debtor will run out of cash and be forced to shut down, thereby losing its enterprise value and reducing the return to the Debtor's estate and creditors as well as the opportunities other stakeholders might have as a result of the sale.  Time is of the essence.

36.    The proposed sale will be subject to higher and better offers submitted by qualified bidders.  All interested persons and entities will be afforded a full, fair and reasonable opportunity to (i) conduct due diligence investigations, (ii) submit bids and to submit higher or otherwise better bids to purchase the Debtor's assets.  I believe that engaging in a competitive process to effectuate a sale of substantially all of the Debtor's assets while preserving enterprise

value will maximize the value of the Debtor's estate for the benefit of all creditors and

stakeholders, including, without limitation, the Debtor's employees who may ultimately be

rehired by the buyer.

**F.   The Need for Other Relief Sought by the Debtor in its First Day Motions.**

a.   Motion for Entry of Interim and Final Orders Authorizing But Not Directing
     Debtor to Maintain Existing Insurance Policies and to Pay any Premium
     Obligations Arising Thereunder.

37.      The Debtor has filed a motion seeking the authority to maintain existing insurance

policies and to pay any premium obligations.

38.      In the ordinary course of its business, Debtor maintains numerous insurance

policies providing coverage for, *inter alia*, commercial general liability, umbrella liability,

excess umbrella liability, automobile, travel accident, shipping and cargo, property, excess

property, flood, foreign liability, fiduciary liability, directors' and officers' liability, and workers'

compensation (collectively, the "Insurance Policies").

39.      Maintaining the Insurance Policies is essential to the preservation of the Debtor's

business and business assets and are in many instances required by regulation, law or contract.

The Debtor makes one combined monthly premium payment in the amount of $14,242.00 for all

Insurance Policies to its broker, R. G. McGraw Insurance Agency.  The premium is reasonable

and I believe it is both appropriate and prudent to maintain insurance covering the debtor's assets

and operations.

b.   Motion for Authorization to Pay Wages, Salaries, Withholding Taxes and
     Employee Benefits.

40.       The Debtor has filed a motion seeking authorization to pay wages, salaries,

withholding taxes and certain employee benefits.

41.      The continued and uninterrupted service of the Debtor's employees is critical to the Debtor's effort to preserve its enterprise value and, by extension, maximize the value of the estate for the benefit of Debtor's creditors and other parties in interest.  The inability to pay or a delay in payment of accrued pre-petition wages and salaries would adversely impact the employees' morale, which could prove disruptive to the Debtor's business and restructuring efforts.  Moreover, without payment for such pre-petition wages and salaries, Debtor's employees would suffer a significant financial hardship.

42.      I believe that the requested relief will allow for a smooth transition into chapter 11 by ensuring that Debtor's current level of operations is maintained as is the dedication and confidence of its employees at a time when the cooperation of its employees is most critically needed.  I feel the relief sought in the Debtor's motion is justified, reasonable and in the best interest of the Debtor.

        c.   Motion for Authorization to Continue to Honor Pre-Petition Customer Programs.

43.      The Debtor has filed a motion seeking authorization to continue to honor its pre-petition customer programs.

44.      In the ordinary course of its business, Debtor provides to its customers one or two year warranties on units and parts purchased from the Debtor.  Typically, when the Debtor is notified that a unit or part is not functioning properly, Debtor will investigate to determine the date of sale and whether such unit or part is still under warranty.  If so, the unit or part is inspected in the field to determine whether the issue is covered under warranty or if it is a result of misuse or mishandling by the customer.  If the issue is covered under warranty and the warranty is still in effect for a particular unit or part, Debtor will repair the unit or part at its own expense.  If the issue is a result of customer misuse or mishandling, or is otherwise not covered

by a warranty, Littleford may still repair the unit or part but the repair costs are paid by the customer (the "Warranty Program").  Servicing the Debtor's Warranty Program can yield a significant amount of revenue on an annual basis.  Moreover, it preserves valuable customer relationships and prevents the loss of value that would result from losing customer confidence.

45.     In addition, in the ordinary course of its business, Debtor routinely receives security deposits from customers who lease units from the Debtor on a month-to-month basis ("Deposit Program").  Security deposits are typically in an amount equal to one monthly rental payment for the particular unit(s) or part(s).  At the end of the applicable rental agreement or if the rental is canceled by the customer, the security deposit is either returned to the customer, or, more typically, the deposit is applied to the rental payment owing to Debtor for the last month of the rental agreement.  Neither I nor the Debtor anticipates having to return any security deposits to its customers, either because the applicable rental agreements are continuing or, with respect to canceled rentals or rental agreements that have expired, the security deposits will be applied to the amounts owing for the last month of the rental periods.  In addition, in situations where the customers may have damaged the rented units or parts, the security deposit is used to offset the costs of repair.  Notwithstanding, I believe it is nevertheless an exercise of prudent business judgment to maintain the Deposit Program in order to preserve customer relationships and by extension the value inherent therein.

d.   Motion for Orders (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Service; (II) Approving the Proposed Form of Adequate Assurance of Payment to Utilities and (III) Establishing Procedures for Resolving Requests for Additional Assurance.

46.     Debtor is currently provided utility service—specifically, electricity, gas, water, telecommunications, and internet services—by the utility providers identified on Exhibit C to the Debtor's motion (the "Utility Providers").  On average, the Debtor spends approximately

$15,000 per month for utility services.  Because these Utility Providers provide essential services, any interruption in such services would prove devastating to the Debtor's ability to continue operations.  The temporary or permanent discontinuation of utility services at the Debtor's location would disrupt operations, which would fundamentally undermine the Debtor's restructuring efforts and, ultimately, creditor recoveries.  Therefore, it is critical that utility services continue uninterrupted during the chapter 11 case and it is likewise an exercise of sound business judgment for the Debtor to take measures to ensure continued service.  I likewise believe that the proposed form of adequate assurance of payment is reasonable in light of the facts and circumstances surrounding this case.

        e.   Motion for Authority to (I) Maintain Existing Bank Accounts and Cash Management System, and (II) Continue Use of Business Forms, Books and Records

47.     The Debtor has filed a motion relating to the maintenance of its bank accounts and cash management system as well as the preservation of use of its business forms.

48.     Debtor maintains two bank accounts—one at MainSource Bank with account numbers ending in 4179 (the "MainSource Account") and one at PNC Bank with account numbers ending in 1804 (the "PNC Account" and, together with the MainSource Account, the "Bank Accounts").

49.     In the ordinary course of business, Debtor utilizes a cash management system to receive and disburse funds (the "Cash Management System").  The MainSource Account is the Debtor's primary account and is the account in which most customer payments are deposited, and the account from which vendor checks are issued and payroll is made.  The PNC Account is used solely for depositing foreign customer checks from international sales.  Once the amounts

from such checks clear in the PNC Account, the funds are typically transferred to the MainSource Account.

50.     Continuation of the Cash Management System is warranted because the Debtor, its estate, and ultimately its creditors would be irreparably harmed by any delay that would result from the Debtor being forced to discontinue its Cash Management System and to implement a new system with new bank accounts and new business forms.  Opening new debtor-in-possession accounts would disrupt Debtor's operations and would create confusion amongst its vendors and other counter-parties and threaten to strain Debtor's relationships with such parties right at the critical time when Debtor is attempting to maximize the value of the estate, and, in turn, creditor recoveries.

51.     In addition, in the ordinary course of its business, Debtor routinely uses various business forms such as invoices, stationary, letterhead, address labels and envelopes, work orders, wire transfer forms, and billing statements.  The Debtor seeks permission to use and to continue to consume their existing business forms without alteration or change in accordance with Local Rule 2015-2(a).  I believe requiring the Debtor to create and print new forms would be a burdensome and needless expense and would cause unnecessary delay and confusion with Debtor's vendors and customers, all to the detriment of the estate and its creditors.

52.     The relief sought in the Debtor's motion is reasonable and preserves value and therefore should be granted.

14

f.  Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 363(c), 364(c)(1-3), 364(d)(1) and 507 and FED. R. BANKR. P. 2002, 4001 and 9014 (I) Authorizing Debtor to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Liens and Super-priority Claims, and (IV) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c)

53.    The Debtor has filed a motion seeking approval of interim debtor-in-possession financing and related relief.  I reviewed the DIP Loan Documents and negotiated the terms of the same and I am very familiar with the proposed DIP Financing Facility.

54.    As I declared above, the Debtor is in need of immediate post-petition financing to advance this bankruptcy case and preserve the enterprise value of the Debtor for the benefit of the creditors, parties in interest and other stakeholders.  The Debtor seeks to borrow within the parameters set forth in the Approved Budget attached hereto as Exhibit B.  The Debtor estimates the interim facility to be no more than $330,000 (which is the projected need through the week of May 17, 2015).[5]  This interim financing facility will enable the Debtor to preserve its enterprise value while expeditiously advancing its restructuring efforts for the benefit of the estate, its creditors, parties in interest and other stakeholders.

55.    I approached approximately 20 lenders seeking debtor-in-possession financing. Despite my good faith effort, none of the lenders approached were willing to provide the Debtor with the financing it would need to advance its restructuring efforts within a chapter 11 bankruptcy case on terms and conditions as favorable as LLPT.

56.    The terms and conditions of the DIP Loan Documents have been negotiated in good faith and at arms' length by and between the Debtor, on one hand, and Lender on the other hand, with all parties being represented by counsel.

---

[5] Availability is based on agreed upon budgeted line item projections.

57.    Finally, the interim DIP Financing Facility is wholly reasonable under the circumstances and absolutely critical to the continuation of the continued viability of the Debtor, the continued sale/restructuring efforts of the Debtor and the preservation of value for creditors, parties in interest and other stakeholders.

Pursuant to 28 U.S.C. § 1746, I swear under penalty of perjury under the laws of the United States of America that the facts, circumstances, and other matters set forth in the First Day Motions and Orders, as well as the foregoing, is true and correct to the best of my knowledge information and belief, with appropriate reliance on the Debtor's officers, employees, and advisors.

Dated: April 2, 2015

J. Garvin Warden
Chief Restructuring Officer

16