## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

———————————————————————— x

In re:                                        :
                                              :    Chapter 11
LITTLEFORD DAY, INC.,                          :
                                              :    Case No. 15-10722 (KG)
                                              :
                     Debtor.[1]                :
———————————————————————— x

**DEBTOR'S MOTION FOR ORDERS: (A)(I) APPROVING DESIGNATION OF STALKING HORSE AND RELATED BID PROTECTIONS IN CONNECTION WITH A SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (II) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (III) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (IV) APPROVING FORM AND MANNER OF NOTICE OF ALL PROCEDURES, PROTECTIONS, SCHEDULES AND AGREEMENTS; AND (V) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; AND (B)(I) APPROVING THE SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING CERTAIN RELATED RELIEF**

Littleford Day, Inc. ("Littleford," "Company," or the "Debtor"), files this motion (the "Motion"), pursuant to sections 105, 363, 365 and 503 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order (the "Bidding Procedures Order"), substantially in the form attached hereto as Exhibit A: (i) approving the designation of the stalking horse bidder and related bid protections; (ii) approving the proposed auction and bidding procedures (the "Bidding Procedures"), which are attached as Exhibit B hereto, for the potential sale of all or substantially all of the Debtor's non-cash assets (the "Transferred Assets"); (iii)

---

[1]The last four digits of Debtor's taxpayer identification number are 7511.  Debtor's corporate headquarters are located at 7451 Empire Drive, Florence, Kentucky 41042.

establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"); (iv) approving the form and manner of notice of all procedures, protections, schedules, and agreements; and (v) scheduling a hearing (the "Sale Hearing") to approve such sale (the "Sale Transaction").   Further, in the event a Sale Hearing is held pursuant to the Bidding Procedures, the Debtor also hereby moves the Court, pursuant to Bankruptcy Code sections 105, 363, 365 and 503 and Bankruptcy Rules 2002, 6004 and 6006, for entry of an order (the "Sale Order"):[2] (i) approving the sale of the Transferred Assets free and clear of all liens, claims, interests and encumbrances (the "Encumbrances"), except to the extent set forth in the Asset Purchase Agreement (as defined herein); (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases as set forth in the Asset Purchase Agreement; and (iii) granting related relief.[3] In support of this Motion, the Debtor relies upon and incorporates by reference the First Day Declaration of J. Garvin Warden, Chief Restructuring Officer of Littleford Day, Inc. (the "First Day Declaration") [Docket No. 13]. In further support of this Motion, the Debtor, by and through its undersigned counsel, respectfully represents:

## I. JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The legal predicates for the relief requested herein are sections 105, 363, 365 and 503 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006 and 9014.

---

[2] The form of Sale Order will be filed with the Court no later than two (2) days after the Bid Deadline.

[3] This Motion contains the Debtor's request for entry of the Bidding Procedures Order and approval of the Sale Order. The Debtor is seeking approval of the Bidding Procedures Order at the initial hearing to be conducted on this Motion. The Sale Order is requested to be considered at the Sale Hearing, should the Sale Hearing occur.

3.      Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), the Debtor consents to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## II.  BACKGROUND

### A.      The Bankruptcy Case

4.      On April 2, 2015, (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtor continues to operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.      No trustee or examiner has been appointed in this chapter 11 case and no committee has been appointed or designated.

### B.      The Debtor

7.      Littleford is a manufacturer of custom-made process equipment (including mixers, dryers and granulators), which have a variety of applications for companies in a broad range of industries, including, without limitation, food and beverage, pharmaceutical, nutraceutical, plastic and chemical, and automotive.  Littleford also maintains a parts business and provides technical guidance, maintenance and advisory assistance to its customers. The Company has been in business since 1882.

8.      Littleford's facility is located in Florence, Kentucky.  While the Company employed as many as sixty-five (65) individuals within the past year, due to substantial financial challenges, Littleford has had to reduce its labor force to twenty-seven (27) employees as of the Petition Date.

9.      Littleford is a small company with significant operational costs.  As of February 28, 2015, Littleford has had approximately $1 million in gross sales and has experienced a dramatic decline in order rate since the end of 2014.  Within the past few years, Littleford's sales have been relatively flat in an environment of rising costs, which in turn has largely reduced its profit margins.  Despite good faith efforts to reduce costs and enhance revenue, the Company simply has been unable to maintain adequate cash flow to satisfy its mounting obligations

10.      Littleford is party to a collective bargaining agreement ("CBA") with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW) AFL-CIO, CLC on behalf of Local 8-0757.  Littleford also sponsors the Littleford Day, Inc. Retirement Plan, a defined benefit plan for its union and salaried employees (the "Pension Plan").  The Pension Plan is currently frozen and underfunded. Littleford is unable to sustain the Pension Plan.

11.      Prior to the Petition Date, Littleford considered a variety of restructuring options. The Company employed a variety of measures to minimize its carrying costs while it explored its alternatives, including the possibility of a sale.  Ultimately, the Company decided it would attempt to effectuate a sale that would preserve its enterprise value and best serve the interests of Littleford's creditors, its employees, and its customers.

12.      Additional factual background information regarding the Debtor and this Motion is set forth in detail in the First Day Declaration.[4]

---

[4] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration or the Asset Purchase Agreement.

**C.**     **The Debtor's Pre-petition Restructuring Efforts and the Stalking Horse Bidder**

13.     As discussed in the First Day Declaration, prior to 2015, the Company determined that its business likely would not be viable in the long term or on a stand-alone basis absent a strategic transaction and the restructuring of its indebtedness.

14.     The Debtor explored sale and restructuring opportunities involving certain competitors/strategic players within the Debtor's industry over the past year.  The Debtor established due diligence e-rooms and various interested parties conducted due diligence.  No prospective buyer expressed a willingness to acquire the equity of the Debtor or otherwise assume its liabilities.

15.     Faced with a fast-approaching liquidity crisis and the fact that the Debtor's business is largely driven by purchase orders which can take as much as nine months (and in some instances over a year) to fulfill, the Debtor had to formulate a sale strategy that would both test the market and likewise preserve its value for the benefit of its creditors, employees, and other stakeholders.  The Debtor needed to identify a prospective buyer who would not only be interested in acquiring its assets but would likewise provide a small debt facility that would enable the Debtor to bridge the liquidity gap between the present and the end of a sale process.  The Debtor could not afford a long, drawn out pre-petition process believing that one (i) involving an all-encompassing search for buyers and (ii) effectuated without the protections of a bankruptcy process, could result in potential business disruption, increased pressure from trade creditors and a material loss of its valuable customers (who could seek out an alternative manufacturer for its equipment needs considering the lag time between purchase orders and delivery).

16.     With the above parameters in mind and a goal of preserving and maximizing value, the Debtor identified a group of potential buyers/interested parties to discuss a potential

transaction.   The Debtor solicited and received letters of intent from interested parties via a limited confidential auction process. Following consideration of multiple proposals, the Debtor designated Loedige Littleford Process Technology, LLC ("LLPT," "Buyer" or "Stalking Horse Bidder")[5] to be a stalking horse bidder.  LLPT is not only willing to purchase substantially all of the Debtor's assets in an expeditious manner but is also willing to provide the Debtor with debtor-in-possession financing it sorely needs in order to effectuate a Sale Transaction on very reasonable terms.

17.     From its pre-petition process, the Debtor identified the Stalking Horse Bidder, whose Stalking Horse Bid (defined below) will stoke competing interest and drive the sale process to a successful conclusion.

18.     The Debtor has also developed a list of approximately 200 prospective buyers whom it will be contacting throughout the sale process, which companies were identified by researching the Debtor's contact lists and databases, various trade organization membership lists and other relevant sources.  Due to the small size of the proposed transaction and the Debtor's business, the Debtor has not retained an investment banker to market its assets nor does it intend to retain such a professional.

**D.      The DIP Financing Facility**

19.     As set forth in greater detail in the DIP Financing Motion [Docket No. 12], the Debtor has an immediate and critical need to obtain post-petition financing and to use cash collateral in order to advance its restructuring efforts and/or to sell certain of the Debtor's assets. The Debtor does not have sufficient available sources of working capital to operate its businesses in the ordinary course of its business without post-petition financing.  The Debtor's ability to

---

[5] Notably, S-Two, LLC owns approximately 25% of LLPT.  Two of the forty-six shareholders of the Debtor (who in the aggregate hold less than 15% of the shares in the Debtor) are members of S-Two, LLC.  No other persons or parties related to the Debtor are affiliated with LLPT.

maintain business relationships with its vendors, suppliers and customers, to pay its employees, and to otherwise fund its operations is essential to the Debtor's continued viability as the Debtor seeks to maximize the value of the assets of the bankruptcy estate for the benefit of all creditors of the Debtor.

20.     As described in the DIP Financing Motion, LLPT has agreed to provide the Debtor with a DIP financing facility in an amount up to $750,000 (the "DIP Financing Facility"), with an interim facility of approximately $330,000 (based on projected need through the week of May 17, 2015).  The interest rate is at 3.5% per annum and there is a facility fee of $15,000.

21.     Notably, the DIP Financing Documents generally establish the following case benchmarks in connection with the DIP Financing Facility (as described in greater detail therein):

(a)     filing of a motion to approve the Asset Purchase Agreement no later than April 6, 2015;

(b)     (ii) entry of the Bidding Procedures Order no later than ten (10) days thereafter in the form, substance and manner required in the Asset Purchase Agreement;

(c)     and (iii) entry of an Order of the Bankruptcy Court approving the sale in the form, substance and manner required in the Asset Purchase Agreement not later than June 8, 2015.

22.     The Debtor submits that the terms of the DIP Financing Facility are both reasonable and vital to preserving the enterprise value of the Debtor.

**E.     The Asset Purchase Agreement**

23.     On April 2, 2015, Littleford and LLPT entered into an agreement wherein LLPT will acquire substantially all of Littleford's assets (other than excluded assets), free and clear of all Encumbrances (the "Asset Purchase Agreement," a copy of which is attached hereto as Exhibit C).

24.    As set forth in greater detail in the Asset Purchase Agreement, the proposed

transaction generally provides for the following:

| | | |
|---|---|---|
| (a) | **Assets to be Purchased** | Substantially all assets of the Debtor, the Transferred Assets |
| (b) | **Excluded Assets** | Cash, a/r, avoidance actions, certain insurance proceeds associated with an outstanding claim, and other assets |
| (c) | **"As is, Where is"** | Except as otherwise stated in the Asset Purchase Agreement, the assets are being sold "as is, where is." |
| (d) | **Purchase Price** | $1,750,000, subject to certain adjustments and the assumption of certain liabilities (together with the Purchase Price is hereinafter referred to as the "Stalking Horse Bid"). |
| (e) | **Cap on Adjustments** | An escrow of $300,000 will be established from sale proceeds to address potential indemnity claims associated with certain representations and warranties that survive for no more than six (6) months post-closing. |
| (f) | **Deposit** | 10% of Purchase Price before application of adjustments |
| (g) | **Assumed Contracts** | Buyer will have the right to designate contracts and leases for assumption and assignment pursuant to the procedures approved by the Court. Unless otherwise stated in the Asset Purchase Agreement, cure claim obligations will be the responsibility of the Debtor, subject to a termination right if cure claim obligations exceed $400,000. |
| (h) | **Subject to Higher/Better** | The proposed sale will be subject to higher/better offers submitted in connection with a sale process and bidding procedures approved by the Court. |
| (i) | **Right to Credit Bid** | LLPT has agreed to provide Debtor with the DIP Financing Facility. LLPT shall have |

|       |                  | the right to credit bid the DIP Financing Facility in connection with the Sale Transaction. |
|-------|------------------|---|
| (j)   | **Closing Date** | Three (3) days following entry of the Sale Order. |

25.     The negotiation of the Asset Purchase Agreement was extensive and at times contentious.   The Asset Purchase Agreement was negotiated, proposed and entered into in good faith and from arms-length bargaining positions.   S-Two LLC was not involved in negotiations with the Debtor.

**F.     The Proposed Bid Protections and Bidding Procedures**

26.     In connection with the Asset Purchase Agreement and the Stalking Horse Bid, the Debtor seeks approval of the following bidding protections (the "Bid Protections"):

(a)     As set forth in greater detail in the Asset Purchase Agreement, Littleford agrees to pay the Stalking Horse Bidder a break-up fee in the amount of $75,000 if: (i) Littleford enters into and closes an Alternative Transaction[6] or (ii) Littleford breaches certain provisions of the Asset Purchase Agreement (the "Break-up Fee").[7]

(b)     The Break-up Fee shall be paid, if an Alternative Transaction closes, at the time of and from the proceeds of such closing.   If no Alternative Transaction closes, the Break-up Fee will be allowed in full as an administrative expense and paid at the same time as other administrative expense claims are paid in the Bankruptcy Case without further order or approval of the Court.

27.     In connection with the Asset Purchase Agreement and the Stalking Horse Bid, the Debtor seeks approval of the Bidding Procedures attached hereto as Exhibit B.   Certain of the

---

[6] "Alternative Transaction" means a transaction with any Person (other than Seller's Affiliates) relating to any (a) direct or indirect acquisition of assets of Seller (but excluding sales of assets in the Ordinary Course of Business) equal to fifty percent (50%) or more of the fair market value of Seller's assets or to which fifty percent (50%) or more of Seller's net revenues or net income are attributable, (b) direct or indirect acquisition of fifty percent (50%) or more of the voting equity interests of Seller, (c) merger, consolidation, other business combination or similar transaction involving Seller or any of its Affiliates, pursuant to which such Person would own fifty percent (50%) or more of the assets, net revenues or net income of Seller or (d) reorganization of Seller resulting in any such Person acquiring fifty percent (50%) or more of the assets of Seller.

[7] There is no expense reimbursement included in the Bid Protections.

key terms of the Bidding Procedures are highlighted as follows pursuant to Local Bankruptcy

Rule 6004-1(c):[8]

- **Access to Diligence Materials:**  To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a party must submit to the Debtor (i) an executed confidentiality agreement reasonably satisfactory to the Debtor and (ii) reasonable evidence demonstrating the party's financial capability to consummate a Sale Transaction for the Assets.

- **Qualified Bid:** is a bid that includes each of the Required Bid Documents (described below) and:

    (1)    is a bid for the Assets at a purchase price that has a value to Littleford that is at least $200,000 in excess of the value of the Stalking Horse Bid;

    (2)    is a binding irrevocable offer to purchase the Assets for cash only (plus the assumption of any liabilities), with no contingencies to closing more burdensome than those of the Stalking Horse Bid;

    (3)    has been timely received by each of the Bid Recipients (as defined below) no later than the Bid Deadline or any extended Bid Deadline;

    (4)    the bidder has established that it has the ability to consummate its proposed transaction within the timeframe contemplated for consummation of the proposed purchase;

    (5)    is not subject to or conditioned on obtaining financing;

    (6)    is not conditioned on the outcome of unperformed due diligence;

    (7)    does not entitle the bidder to any termination or break-up fee, expense reimbursement, or similar type of payment;

    (8)    is a good faith, *bona fide* offer to purchase the Assets;

    (9)    is not inclusive of any amount anticipated to be owed for taxes which may be due on account of the transfer contemplated by such bid;

---

[8] The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

(10)   by its terms will remain open and irrevocable until the selection of the High Bidder (as defined below) in conjunction with the Auction, unless identified as a "<u>Backup Bidder</u>" (as defined below) in which case the terms will remain open as required for the Backup Bidder in the Bidding Procedures;

(11)   contains information regarding the regulatory approvals necessary to consummate the Sale and the process which will be used to obtain such approvals (if any);

(12)   notwithstanding any of the foregoing, to the extent a Qualified Bid proposes to assume any contract or obligations of Littleford, such assumption shall be subject to the consent of each relevant counterparty or creditor, or, to Court approval under applicable law notwithstanding the failure to obtain such consent.

- **<u>Required Bid Documents/Deposit</u>:**  Include the following:

   (1)   A written irrevocable offer that expressly states the terms of the offer, including the purchase price being offered for the Assets. Any offer must include: (a) the full name and identity of the bidder; (b) the full names and identities of the bidder's advisors (if any); and (c) an express statement that the bidder has read, understands, and agrees to be bound by and comply with the Bidding Procedures.  The foregoing shall apply to all bids made by any bidder or on behalf of any bidder.

   (2)   A clean and black-lined copy of an asset purchase agreement marked against the Asset Purchase Agreement and initialed to show those amendments and modifications (including, for example, price and terms) that the bidder proposes (each a "<u>Marked Asset Agreement</u>"), signed by an individual authorized to bind the proposed bidder; provided however, that any such amendments or modifications shall not be materially more burdensome to Littleford than the terms of the Asset Purchase Agreement.  Subject to the first sentence of this paragraph, Littleford reserves the right, where appropriate in its business judgment, to modify the asset purchase agreement with any bidder by accepting reasonable changes as determined by Littleford.

   (3)   Updated written evidence of the bidder's financial ability to purchase the Assets in whole, which Littleford determines evidences the bidder's ability to timely consummate the Sale and perform under the Marked Asset Agreement

(4)    A written list of each executory contract and unexpired lease the assumption and assignment of which is a condition to consummation of the Sale.

(5)    If any bid is conditioned on the assumption and assignment of executory contracts or unexpired leases of real property, then such bidder shall be required to provide adequate assurance of future performance of such contracts or leases with the bid.

(6)    A written list of all liabilities that the bidder proposes to assume, if any.

(7)    <u>Good Faith Deposit</u>: Each bid must be accompanied by a deposit in the amount of ten percent (10%) of the purchase price set forth in the Marked Asset Agreement (before adjustments/reductions), which shall be placed in an escrow account to be identified and established by the Debtor (the "<u>Good Faith Deposit</u>").

- **<u>Qualified Bidder</u>:**    A party or person who submits a Qualified Bid shall be a "<u>Qualified Bidder</u>."

- **<u>Bid Deadline</u>:**    To be considered a timely bid for the Auction, written copies of each Qualified Bid containing each of the Required Bid Documents (described above) must be delivered to the following persons (collectively, the "<u>Bid Recipients</u>"): (i) Littleford Day, Inc., Attn: Glenn Vice, 741 Empire Drive, Florence, Kentucky 41042 and via email to gvice@littleford.com and garvinwarden@gmail.com; (ii) Michael J. Roeschenthaler, Esquire, McGuireWoods, LLP, EQT Plaza, 625 Liberty Avenue, 23rd Floor, Pittsburgh, Pennsylvania 15222-3142, counsel for Littleford and via email to mroeschenthaler@mcguirewoods.com; (iii) John F. Carlton, Esquire, Whiteford, Taylor & Preston L.L.P., Seven Saint Paul Street, Baltimore, Maryland 21202, counsel for Stalking Horse Bidder and via email to jcarlton@wtplaw.com; and (iv) [COMMITTEE COUNSEL] **SO THAT SUCH BID IS RECEIVED NO LATER THAN 5:00 P.M. (PREVAILING EASTERN TIME) ON APRIL ____, 2015** (the "<u>Bid Deadline</u>").    The Bid Recipients shall treat the Qualified Bids and all related documents and information with confidentiality, and, as applicable, in accordance with existing confidentiality agreements. Notwithstanding the foregoing, if the Debtor receives a bid prior to the Bid Deadline that is not a Qualified Bid the Debtor may provide the Qualified Bidder with the opportunity to remedy any deficiencies prior to the Auction in its sole discretion.

- **<u>Auction and Auction Procedures</u>**:

(1)    In evaluating whether any Qualified Bidder has submitted a higher and better bid, Littleford may consider, among other things: (i) the number, type and nature of any changes to the Asset Purchase

Agreement as indicated on the Marked Asset Agreement; (ii) the extent to which such modifications are likely to delay closing of the proposed sale to such bidder and the cost to the bankruptcy estate from such modifications or delay; (iii) the purchase price and the bidder's financial status; (iv) the probability of a prompt closing; (v) the full financial value of the bid for Littleford's estate, including the impact of any such bid on claims against the estate; (vi) the amount of any escrows required under the agreement as well as the length of time such escrows must remain in place; and (vii) and any other reasonable factors determined at the Littleford's discretion.

(2)     If no Qualified Bids other than the Asset Purchase Agreement from the Stalking Horse Bidder are received by the Bid Deadline, then the Auction will not occur, the Asset Purchase Agreement will be deemed the High Bid and, subject to the termination rights under the Asset Purchase Agreement, Littleford will pursue entry of an order by the Court approving the Asset Purchase Agreement and authorizing the sale of the Transferred Assets and the transfer of the Assumed Liabilities to the Stalking Horse Bidder.

(3)     If one or more bids are received by the Bid Deadline, then Littleford will review the terms and conditions of each Qualified Bid received and the factors relevant to the sale process including, without limitation, those factors affecting the speed and certainty of consummating the Sale.   After all Qualified Bids have been reviewed, Littleford shall determine those parties who are Qualified Bidders deemed qualified to participate in the Auction. The Auction shall take place on May ____, 2015 at 10:00 A.M. at the offices of McGuireWoods LLP, or such other time and place to be designated by Littleford in writing.   Only Qualified Bidders who have been invited by Littleford to participate in such Auction will be eligible to participate at the Auction.   Each Qualified Bidder will be required to confirm immediately prior to the start of the Auction that they have not engaged in any collusion with respect to the bidding or the sale.   At the start of the Auction, Littleford (or its agent(s) as the case may be) will announce the then-highest and best Qualified Bid to be subject to overbidding. During the Auction, bidding shall begin initially with the highest and best Qualified Bid as determined by Littleford.   Qualified Bidders shall have no more than sixty (60) minutes to respond to any previous bid submitted during the Auction.   The Stalking Horse Bidder shall be permitted to credit bid any amount due to Stalking Horse Bidder under any debtor-in-possession financing approved by the Court.   The Auction will be recorded by stenographic, audio or video means.

(4)     During the course of the Auction, Littleford shall inform each participant which Qualified Bid reflects, in Littleford's view, the highest and best offer.

(5)     The Auction may be adjourned in Littleford's reasonable discretion.  Reasonable notice via overnight mail, electronic mail or other means of such adjournment and the time and place for resumption of the Auction shall be given to all Qualified Bidders.

(6)     The initial overbid at the Auction shall be at least $50,000 in excess of the highest and best Qualified Bid as announced by Littleford at the start of the Auction.  Thereafter, Littleford shall not consider any subsequent bid at the Auction unless the overbid exceeds the previous highest bid by at least $50,000 (or such lesser amount that Littleford shall announce at the Auction) (the "Bid Increment").  In determining the amount of the bid of the Stalking Horse Bidder for the purposes of the Auction, Littleford shall add the amount of the Break-up Fee under the Asset Purchase Agreement to the amount of the Stalking Horse Bidder's bid.

(7)     No additional deposit beyond the original Good Faith Deposit shall be required in connection with overbidding provided that the High Bidder shall be required to make a representation at the end of the Auction that it will provide any additional deposit necessary so that its Good Faith Deposit is equal to the amount of ten percent (10%) of the Purchase Price before downward adjustments.

(8)     Littleford intends to sell the Assets to the Qualified Bidder who represents the highest and otherwise best bid (the "High Bid") at the Auction, which shall ultimately be subject to Court approval at the Sale Hearing.  No such bid shall be deemed rejected until such rejection is communicated in writing by Littleford.

(9)     Upon conclusion of the Auction, Littleford will identify the High Bid; the Qualified Bidder having submitted the High Bid will be deemed the "High Bidder".  The High Bidder shall be bound to comply with the terms of the respective sale agreement.

(10)    Backup Bidder:    Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction, as determined by the Debtor, in the exercise of its business judgment, will be designated as the backup bidder (the "Backup Bidder"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more overbids at the Auction, the Backup Bidder's final overbid) (the "Backup Bid") open and irrevocable until the earlier of (i) 5:00

p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the date of entry of the Sale Order, or (ii) the closing of the transaction with the High Bidder, unless the Backup Bidder is the Stalking Horse Bidder, in which case, the Backup Bid shall remain open and irrevocable until no later than the date that is fifteen (15) days after the date of entry of the Sale Order, or (ii) the closing of the transaction with the High Bidder.

**Sale Hearing or Confirmation Hearing:** After the Auction, Littleford will seek the entry of an order authorizing and approving the Sale to the High Bidder at a Sale Hearing which is scheduled for _____, 2015 at ___, before the Honorable Kevin Gross, United States Bankruptcy Court for the District of Delaware, Bankruptcy Court, 824 N. Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801, or as soon thereafter as counsel may be heard.

Following the Sale Hearing, if the High Bidder fails to consummate an approved transaction, the Backup Bidder will be deemed to have the new prevailing bid, and the Debtor will be authorized, but not required, without further order of the Bankruptcy Court, to consummate the transaction with the Backup Bidder. In such case of a breach or failure to perform on the part of the High Bidder (including any Backup Bidder designated as a High Bidder), the defaulting High Bidder's deposit shall be forfeited to the Debtor. The Debtor, on its behalf and on behalf of its estate, specifically reserves the right to seek all available damages, including specific performance, from any defaulting High Bidder (including any Backup Bidder designated as a High Bidder) in accordance with the terms of the Bidding Procedures and/or applicable asset purchase agreement.

- **Irrevocability Period:** EXCEPT AS OTHERWISE PROVIDED FOR IN THE BIDDING PROCEDURES, ALL BIDS ARE IRREVOCABLE AND SHALL REMAIN BINDING UPON THE BIDDERS UNTIL THE SELECTION OF A HIGH BIDDER AND BACKUP BIDDER AT THE AUCTION.

- **Expenses:** Except for the Stalking Horse Bidder, with respect to any "stalking horse" protection, any bidders presenting bids shall not be entitled to any "stalking horse" protection and shall bear their own expenses in connection with the Sale, whether or not such Sale is ultimately approved, in accordance with the terms of the purchase agreement.

28.     Due to the Debtor's strained cash position, the Debtor will need to advance the sale process expeditiously.  The Debtor is requesting that the Bankruptcy Court enter an Order approving the Bidding Procedures by no later than ten (10) days after the filing of this Motion. The Debtor intends to hold an auction approximately sixty (60) days following the Petition Date and will seek entry of a Sale Order by no later than June 8, 2015.  The Debtor anticipates closing

on the sale within five (5) days of entry of the Sale Order, thereby concluding the sale process between 70 and 75 days following the Petition Date.

## RELIEF REQUESTED

29.    By this Motion, the Debtor first requests entry of the Bidding Procedures Order, which will authorize and approve, among other things: (i) designation of the Stalking Horse and related Bid Protections, (ii) the Bidding Procedures for conducting the auction for the sale of the Debtor's assets; (iii) the Assumption and Assignment Procedures; (iv) the form and manner of notice with respect to all procedures, protections, schedules and agreements; and (v) the scheduling of the Sale Hearing to approve any such Sale Transaction with respect to the High Bid.

30.    Second, in the event that the Sale Hearing is necessary in accordance with the Bidding Procedures, at the Sale Hearing, the Debtor will request entry of the Sale Order that will, *inter alia*, approve: (i) the sale of the Debtor's assets in accordance with the terms of the Asset Purchase Agreement executed by the High Bidder, which shall be free and clear of all Encumbrances, including rights or claims based on any taxes or successor or transferee liability (other than certain expressly specified permitted encumbrances and assumed liabilities, all as more specifically set forth in the Asset Purchase Agreement); and (ii) the assumption and assignment of certain executory contracts and unexpired leases (as set forth in the Asset Purchase Agreement) related to the Debtor's assets and the Sale Transaction.

## BASIS FOR RELIEF

### A.    Necessity for a Sale and Stalking Horse

31.    As discussed in further detail in the First Day Declaration, the Debtor has limited resources and does not have adequate cash flow to sustain itself in the near term.  Prior to the Petition Date, Littleford considered a variety of restructuring options.  The Company also

employed a variety of measures to minimize its carrying costs while it explored its options, including the possibility of a sale.  Ultimately, the Company determined in an exercise of its reasoned business judgment that its best course of action would be to attempt to effectuate a sale that would preserve its enterprise value and best serve the interests of Littleford's creditors, its employees, and its valued customers.

32.      Faced with a fast-approaching liquidity crisis, coupled with the risk of losing valuable customers due to the potential delay and uncertainty of a sale process outside of a bankruptcy process (as well as the need to demonstrate some level of clarity with respect to the potential transitioning and fulfillment of pending purchase orders), the Debtor implemented a well-tailored pre-petition process that yielded a Stalking Horse Bidder who not only would provide very reasonable bridge financing terms but also has personnel and management with real and meaningful industry experience.

33.      The Debtor submits that the selection of LLPT as the Stalking Horse Bidder is an exercise of sound business judgment.  The process employed to date provides parties in interest and other stakeholders such as employees and customers with level of clarity during a very challenging time in the Company's long history.  The Debtor identified an experienced industry player for its Stalking Horse Bidder, while preserving the right to solicit competing offers from hundreds of other potential buyers.  The Debtor believes the designation of LLPT as the Stalking Horse Bidder is unquestionably beneficial to the bankruptcy estate and enhances the sale process.

34.      For the foregoing reasons, LLPT should be designated as the Stalking Horse Bidder.

**B.      The Proposed Bidding Procedures and Bid Protections are Reasonable and Designed to Maximize Value**

35.      The Debtor's highest priority in this chapter 11 case is to maximize the value of its business for the benefit of its creditors, its employees and other stakeholders.  To do so, it needs to quickly and efficiently advance a sale process that not only encourages third-party participation but likewise protects the ongoing business in the interim, including, but not limited to, its employees and customer relationships.

36.      Failure to effectuate a sale within the timeframe proposed above will likely result in the deterioration of the value of the Debtor's assets as there is a substantial risk that the Debtor will run out of cash and be forced to shut down, thereby losing its enterprise value and reducing the return to the Debtor's estate and creditors as well as the opportunities other stakeholders might have as a result of the sale.  As noted above, the DIP Financing Facility contains case benchmarks for a sale process, which include a requirement for entry of a Sale Order by no later than June 8, 2015; thus delay could result in a financing default that could effectively derail this chapter 11 case.

37.      The Bidding Procedures allow the Debtor to continue the sale process begun prior to the Petition Date in a further effort to maximize the value of the Debtor's estate.

38.      The Stalking Horse Bid establishes a floor price above which competing bidders will need to overbid. The Bidding Procedures describe, among other things, the procedures for interested parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of any ultimately successful bidders, and the deadlines with respect to the foregoing (the "Bidding Process"). All interested persons and entities will be afforded a full, fair and reasonable opportunity to purchase all or substantially all of the Debtor's assets.  Engaging

in such a competitive process to effectuate a sale of substantially all of the Debtor's assets while preserving enterprise value will maximize the value of the Debtor's estate for the benefit of all creditors and stakeholders, including, without limitation, the Debtor's employees who may ultimately be rehired by the buyer.

39.    The Bid Protections are fair and reasonable in light of the circumstances because, in the event the Bid Protections were triggered, the Stalking Horse Bidder's efforts will have promoted more competitive bidding, and thereby increased the chances that the Debtor will receive the highest or otherwise best offer for the sale of all or substantially all of its assets, to the benefit of the Debtor's creditors.

40.    The Debtor submits that the Bidding Process affords the Debtor and interested parties a sufficient opportunity to pursue a sale process that will maximize the value of its estate.

C.    **Notice Procedures**

41.    <u>Notice of Sale Transaction and Sale Hearing</u>.  Within three (3) business days after the entry of the Bidding Procedures Order, or as soon thereafter as practicable (the "<u>Mailing Date</u>"), the Debtor shall serve this Motion, the Bidding Procedures Order, and the Bidding Procedures by first-class mail, postage prepaid, upon (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Transferred Assets at any time; (b) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Transferred Assets; (c) all federal, state and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) the United States Trustee's office; (e) the Internal Revenue Service; (f) counsel to any official committee appointed in the chapter 11 case; (g) the parties included on the Debtor's list of twenty (20) largest unsecured creditors; (h) those parties who have filed the appropriate notice requesting notice of all pleadings filed in the chapter 11 case; (i) all equity interest holders; (j)

the Pension Benefit Guaranty Corporation; (k) all parties (or their counsel) to any labor contract, including but not limited to the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW), AFL-CIO, CLC on behalf of Local 8-0757; (l) federal, state, and local governmental bodies responsible for enforcement of environmental laws and regulations applicable to the leased real property upon which the Debtor operates; (m) the Debtor's real property landlord; (n) all other creditors of the Debtor; and (o) all pension beneficiaries.  Such notice shall be sufficient and proper notice of the proposed Sale Transaction with respect to known interested parties.

42.     <u>Sale Notice</u>.  On the Mailing Date or as soon thereafter as practicable, the Debtor shall serve by first-class mail, postage prepaid, the sale notice (the "<u>Sale Notice</u>"), substantially in the form attached hereto as <u>Exhibit D</u>, upon all other known creditors of the Debtor, including all parties in interest or creditors otherwise required to be served pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.

43.     <u>Auction Notice</u>. As soon as possible after the Bid Deadline the Debtor shall file, but not serve, a notice indicating whether the Auction will be held, and if applicable, the date and time of the Auction (the "<u>Auction Notice</u>").  If the Auction will not be held the Auction Notice will also provide notice of the cancellation of the Sale Hearing.

44.     <u>Sale Hearing Notice</u>. As soon as possible after the conclusion of the Auction the Debtor shall file, but not serve, a notice identifying any successful bidder and indicating whether the Sale Hearing will be held (the "<u>Sale Hearing Notice</u>"), substantially in the form attached hereto as <u>Exhibit E</u>.  The notice will indicate the deadline for objecting to the sale of the Transferred Assets to the High Bidder and the date and time of the Sale Hearing.

**D.**     **Assumption and Assignment Procedures**

45.     The Debtor proposes the following procedures for notifying counterparties to executory contracts and unexpired leases of potential cure amounts.

46.     Within five business (5) days after the entry of the Bidding Procedures Order, or as soon thereafter as practicable, the Debtor will file with this Court a notice of cure amount (the "Cure Notice"), substantially in the form attached hereto as Exhibit F, and serve the Cure Notice on all non-debtor parties (the "Contract Notice Parties") to its executory contracts or unexpired leases ("Debtor Contracts").

47.     The Cure Notice shall: (i) state the cure amounts that the Debtor believes are necessary to assume such Debtor Contracts pursuant to section 365 of the Bankruptcy Code (the "Cure Amount"); (ii) notify the non-debtor party that such party's contract or lease may be assumed and assigned to a purchaser of the Transferred Assets at the conclusion of the Auction; (iii) state the date of the Sale Hearing and that objections to any Cure Amount or to assumption and assignment will be heard at the Sale Hearing or at a later hearing, as determined by the Debtor; and (iv) state a deadline by which the non-debtor party shall file an objection to the Cure Amount or to the assumption and assignment of the Debtor Contracts; provided, however, that the inclusion of a contract, lease or agreement on the Cure Notice shall not constitute an admission that such contract, lease or agreement is an executory contract or lease.[9]

48.     The Debtor requests that the Court set the deadline (the "Cure Objection Deadline") to object to any Cure Amount or to assumption and assignment providing that any such objection must be filed with the Court on or before twenty (20) days after the filing of the Cure Notice and served on: (1) Littleford Day, Inc., Attn:  Glenn Vice, 7451 Empire Drive,

---

[9] For an avoidance of doubt, the Debtor reserves all of its rights, claims and causes of action with respect to the contracts, leases and agreements listed on the Cure Notice.

Florence, Kentucky 41042-2985; (2) counsel for the Debtor, mroeschenthaler@mcguirewoods.com and mjoyce@crosslaw.com; and (3) counsel for the Stalking Horse Bidder. Any such objection shall: (i) be in writing; (ii) state the basis for such objection; and (iii) state with specificity what cure amount the party to the Debtor Contract believes is required (in all cases with appropriate documentation in support thereof). If a High Bidder prevails at the Auction, then the deadline to object to adequate assurance shall be extended to the date of the Sale Hearing, but any such objection must be received before the start of the Sale Hearing; provided, however, that the deadline to object to the Cure Amount shall not be extended.

49.    As soon as possible after the conclusion of the Auction, the Debtor shall file with the Bankruptcy Court the Sale Hearing Notice that identifies any High Bidder and provides notice that the Debtor will seek to assume and assign the Debtor Contracts at the Sale Hearing. At the Sale Hearing, the Debtor (in consultation with the High Bidder) shall: (i) present evidence necessary to demonstrate adequate assurance of future performance by the High Bidder; and (ii) request entry of an order granting approval of the assumption and assignment of any Debtor Contracts to the High Bidder.

50.    Unless a non-debtor party to any executory contract or unexpired lease, including an unexpired real property lease, files an objection to the Cure Amount by the Cure Objection Deadline, such counterparty shall be: (i) forever barred from objecting to the Cure Amount; and (ii) forever barred and estopped from asserting or claiming any Cure Amount, other than the Cure Amount listed on the Cure Notice against the Debtor, any High Bidder or any other assignee of the relevant contract.

51.     In addition, to the extent that a non-debtor counterparty to a Debtor Contract was not provided with a Cure Notice (any such contract or lease a "Previously Omitted Contract"), the Debtor will notify the High Bidder within three (3) business days of the omission. If the High Bidder advises the Debtor in writing that the Debtor Contract should be included as a Transferred Asset, the Debtor shall serve a notice (the "Previously Omitted Contract Notice") to the counterparties to the Previously Omitted Contract indicating the Debtor's intent to assume and assign the Previously Omitted Contract. The counterparties will have fifteen (15) business days to object to the Cure Amount or the assumption. If the parties cannot agree on a resolution, the Debtor will seek an expedited hearing before the Court to determine the Cure Amount and approve the assumption. If there is no objection, then the counterparties will be deemed to have consented to the assumption and assignment and the Cure Amount, and such assumption and assignment and the Cure Amount shall be deemed approved by the Sale Order without further order of this Court.

52.     The Debtor will file a notice with the Court listing the Debtor Contracts, if any, that the Debtor has determined not to assume, prior to the Sale Hearing.

## APPLICABLE AUTHORITY

53.     "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" Continuing Creditors' Comm. of Star Telecommunications, Inc. v. Edgecomb, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988)); see also Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008). Thus, this Court should grant the relief requested in this Motion if the

Debtor demonstrates a sound business justification therefore. See In re Delaware & Hudson Ry. Co., 124 B.R. 169, 179 (D. Del. 1991).

54.    The Debtor has sound business justifications for selling all or substantially all of its assets as contemplated by this Motion. The Debtor continues to experience difficulties in achieving positive cash flow. As a result, the Debtor's current capital needs are incompatible with its existing business model and operating needs.

55.    Accordingly, the Debtor has determined that the proposed sale process is the best way to maximize value. Further, the Debtor submits that designation of LLPT as the Stalking Horse Bidder serves the best interests of the estate, its creditors, parties in interest and other stakeholders and therefore should be approved.

**A.    The Bidding Procedures Are Fair And Are Designed To Maximize The Value Received For The Acquired Assets.**

56.    Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Debtor believes that the Bidding Procedures are appropriate under Bankruptcy Code sections 105 and 363 to ensure that the Bidding Process is fair and reasonable and will yield the maximum value for its estate and creditors. The Bidding Procedures proposed herein are designed to maximize the value received for the Debtor's assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids. The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid. Thus, the Debtor and all parties in interest can be assured that the consideration for the Transferred Assets will be fair and reasonable. At the same time, the Bidding Procedures

provide the Debtor with the opportunity to consider all competing offers and to select, in its reasonable business judgment, the highest and best offer for the Transferred Assets.

57. Accordingly, the Debtor believes the Court should approve the Bidding Procedures. Similar procedures have been previously approved by this Court. See, e.g., In re Savient Pharm., Inc., Case No. 13-12680 (MFW) (Bankr. D. Del. Nov. 4, 2013); In re Synagro Techs., Inc., Case No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013); In re ICL Holding Co., Inc., Case No. 12-13319 (KG) (Bankr. D. Del. Jan. 25, 2013); In re Vertis Holdings, Inc., Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012).[10]

**B.    The Bid Protections are Necessary to Preserve the Value of the Debtor's Estate**

58. The Debtor believes the Bid Protections are fair, reasonable and will ensure the Debtor's ability to maximize the realizable value of the Transferred Assets for the benefit of the Debtor's estate, creditors and other parties-in-interest. Approval of break-up fees and other forms of bidding protections in connection with the sale of assets pursuant to section 363 of the Bankruptcy Code has become established practice in chapter 11 cases. Such bidding protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with an opportunity to enhance the value received by its estate through an auction process. Historically, bankruptcy courts have approved bidding incentives similar to the Bid Protections pursuant to the "business judgment rule." See e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650 (S.D.N.Y. 1992); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

59. The United States Court of Appeals for the Third Circuit, however, has established standards for determining the propriety of bidding incentives in the bankruptcy

---

[10] Because of the voluminous nature of the orders cited herein, they are not attached to this Motion. Copies of these orders, however, are available on request.

context. In re Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999); see also In re Reliant Energy Channelview LP, 594 F.3d 200 (3d Cir. 2010). The Court held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some post-petition benefit to the debtor's estate. See O'Brien, 181 F.3d at 533. The Court of Appeals defined at least two instances in which bidding incentives may benefit the estate. First a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if the assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Id.

60.     The Bid Protections are reasonable and appropriate in light of the size and nature of the transaction and the efforts that would be expended by any Stalking Horse Bidder. Moreover, the Bid Protections will not diminish the estate. The Debtor does not intend to terminate the Stalking Horse Bidder's Asset Purchase Agreement if to do so would incur an obligation to pay the Bid Protections, unless to accept an alternative bid, which bid must exceed the consideration offered by the Stalking Horse Bidder by an amount sufficient to pay the Bid Protections.

61.     Furthermore, the Break-Up Fee proposed herein is within the spectrum of termination fees approved by bankruptcy courts in chapter 11 cases.  See, e.g., In re Global

Motorsport Group, Inc., *et al.*, Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 14, 2008) (Court

approved a break-up fee of approximately 4%, or $ 500,000 in connection with sale); In re

FoxMeyer Corp. *et al.*, Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9,

1996) (Court approved termination fee of 7.47% in connection with sale of substantially all of

Debtor's assets); In re Edison Bros. Stores. Inc. et al., Case No. 95-1354 (PJW) (Bankr. D. Del.,

Dec. 29, 1995) (Court approved termination fee of 3.5%).

## C.    Approval Of The Sale Transaction Is Warranted Under Bankruptcy Code Section 363(b).

62.    Section 363(b)(1) of the Bankruptcy Code provides: "The trustee, after notice and

a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 105(a) provides in relevant part: "The

Court may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title." 11 U.S.C. § 105(a).

63.    A debtor should be authorized to sell assets outside of the ordinary course of

business pursuant to section 363 of the Bankruptcy Code and prior to obtaining a confirmed plan

of reorganization if it demonstrates a sound business purpose for doing so. See In re Abbotts

Dairies of Penn., Inc., 788 F.2d 143, 147-49 (3d Cir. 1986) (implicitly adopting the "sound

business judgment test" of Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),

722 F.2d 1063, 1070 (2d Cir. 1983)); In re Dura Auto. Sys., Inc., Case No. 06-11202 (KJC),

2007 WL 7728109, at *5 (Bankr. D. Del. Aug. 15, 2007) (finding that "[t]he Debtors have

demonstrated compelling circumstances and a good, sufficient, and sound business purpose and

justification for the Sale prior to, and outside of, a plan of reorganization."); Dai-Ichi Kangyo

Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242

B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of

property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions"); Delaware & Hudson Ry. Co., 124 B.R. at 176 (sale of substantially all of debtor's assets outside of reorganization plan is appropriate when a sound business reason justifies such a sale); see also In re Lionel, 722 F.2d at 1070; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (stating that the "sound business purpose test" is appropriate). Once a court has determined there is a sound business justification for a sale outside of a plan, the court must also determine that (i) the trustee has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable and (iii) the purchaser is proceeding in good faith. Delaware & Hudson, 124 B.R. at 176.

64.     The Debtor submits that the sale of the Transferred Assets is based upon the sound business judgment of the Debtor. As explained above, the Debtor has determined that a sale, conducted in accordance with the Bidding Procedures, is not only in the best interests of the Debtor, its creditors, its estate and other parties in interest, but it is the best viable option to maximize the value of its business.

65.     The Debtor also meets the additional requirements necessary to approve a sale under section 363 of the Bankruptcy Code. As stated herein, the Debtor will provide adequate notice of the proposed Sale Transaction to interested parties, and the Debtor believes that the aforementioned notice procedures are reasonable and adequate under the circumstances. Accordingly, it is a valid exercise of the Debtor's business judgment to seek the relief requested by this Motion.

**D.      The Proposed Sale Transaction Satisfies The Requirements Of Bankruptcy Code Section 363(f) For A Sale Free And Clear Of Interests.**

66.     Bankruptcy Code section 363(f) provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

67.     As Bankruptcy Code section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet one of the five (5) conditions of section 363(f). Because the Debtor does not have any pre-petition secured debt, if the Court approves the DIP Financing Facility, the only lien against the Debtor's assets would be the DIP Financing Facility, which is capped at $750,000.  Considering the proposed Purchase Price greatly exceeds that amount, subsection 363(f)(3) is satisfied (and potentially (f)(5) if LLPT is ultimately the High Bidder). As such, pursuant to Bankruptcy Code section 363, the Debtor may sell the Transferred Assets free and clear of all liens, claims, and encumbrances.

68.     The Debtor also submits that it is appropriate to sell the Transferred Assets free and clear of successor liability relating to the Debtor's business. Such limitations on successor liability ensure that the High Bidder is protected from any claims or lawsuits premised on the theory that the High Bidder is a successor in interest to the Debtor. Courts have consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy Code section 363 sale takes free and clear from successor liability relating to the debtor's business. See, e.g., In re Trans World

Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); In re Leckie Smokeless Coal Co., 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); In re Insilco Techs., Inc., 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); see also, In re General Motors Corp., 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009) (holding that "[T]he law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."), affd sub nom. In re Motors Liquidation Co., 428 B.R 44, and aff'd 430 B.R. 65 (S.D.N.Y. 2010); In re Chrysler  LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[I]n personam claims, including any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction."), aff'd, 576 F.3d 108 (2d Cir. 2009).

69.     The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, the Debtor would run the risk that potential bidders may not enter the Auction or, if they did, would do so with reduced bid amounts. To that end, the High Bidder should not be liable under any theory of successor liability relating to the Debtor's businesses, but should hold the Transferred Assets free and clear.

E.    **A Successful Bidder Should Be Entitled To The Protections Of Bankruptcy Code Section 363(m).**

70.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 8 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Congoleum Corp., Case No. 03-51524, 2007 WL 1428477, *2 (Bankr. D.N.J. May 11, 2007); Abbotts Dairies of Penn., 788 F.2d at 147.

71.    The Debtor will present facts to demonstrate that the High Bidder's agreement was negotiated at arms-length, with both parties represented by their own counsel. Accordingly, the Debtor requests that the Sale Order include a provision that the High Bidder for the Transferred Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtor believes that providing the High Bidder with such protection will ensure that the maximum price will be received by the Debtor for the Transferred Assets and closing of the same will occur promptly.

F.    **Assumption And Assignment Of Executory Contracts And Unexpired Leases Should Be Authorized.**

72.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See, e.g., In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim, or caprice); see also In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of

business judgment by the bankruptcy court"); Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp., 872 F.2d 36, 39-40 (3d Cir. 1989) (same). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. See Group of Institutional Investors v. Chicago, M., St. P. & P.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp, 872 F. 2d at 39-40.

73.     The business judgment test "'requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y 1984)). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. See Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure[], or provide[] adequate assurance that the [debtor] will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

74.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. See In re Rickel Home Centers, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); see also In re Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

75.    Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." In re DBSI, Inc., 405 B.R. 698, 708 (Bankr. D. Del. 2009); EBG Midtown S. Corp. v. McLaren/Hart Env. Engrg Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); see also In re Decora Indus., 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("adequate assurance falls short of an absolute guaranty of payment"); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

76.    Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

77.    To facilitate and effectuate the Sale Transaction, the Debtor requests approval under Bankruptcy Code section 365 of the Debtor's assumption and assignment of the Debtor Contracts to the High Bidder. The Debtor further requests that the Sale Order provide that the Debtor Contracts will be transferred to, and remain in full force and effect for the benefit of, the High Bidder notwithstanding any provisions in the Debtor Contracts, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (3) that prohibit such assignment.

78.    The Debtor contemplates that the High Bidder will be able to provide adequate assurance of future performance in connection with any assigned executory contracts and leases

because such High Bidder must submit evidence sufficient to demonstrate its financial wherewithal and ability to consummate the Sale Transaction.

79.     The Debtor, in coordination with the High Bidder, will present facts at the Sale Hearing to show the financial credibility, willingness, and ability of the High Bidder to perform under the Debtor Contracts. The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the High Bidder to provide adequate assurance of future performance under the Debtor Contracts, as required under Bankruptcy Code section 365(b)(1)(C). Further, as set forth above, the Debtor will give notice to all parties to the Debtor Contracts or the Previously Omitted Contracts of its intention to assume the Debtor Contracts or the Previously Omitted Contracts, as the case may be, and what the Debtor believes are the Cure Amounts.

80.     Accordingly, the Debtor submits that implementation of the proposed Assumption and Assignment Procedures is appropriate in these cases. The Court, therefore, should have a sufficient basis to authorize the Debtor to reject or assume and assign contracts as will be set forth in the High Bidder's Asset Purchase Agreement.

**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(H)**

81.     The Debtor also requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The sale of the Transferred Assets must be approved and consummated promptly in order to preserve the value of the Transferred Assets. Therefore, time is of the essence in consummating the Sale Transaction, and the Debtor and the Buyer intend to close the Sale Transaction as soon as reasonably practicable. Accordingly, the

Debtor respectfully requests that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

82.     Notice of this Motion shall be given to: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Transferred Assets at any time; (b) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Transferred Assets; (c) all federal, state and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) the United States Trustee's office; (e) the Internal Revenue Service; (f) counsel to any official committee appointed in the chapter 11 case; (g) the parties included on the Debtor's list of twenty (20) largest unsecured creditors; (h) those parties who have filed the appropriate notice requesting notice of all pleadings filed in the chapter 11 case; (i) all equity interest holders; (j) the Pension Benefit Guaranty Corporation; (k) all parties (or their counsel) to any labor contract, including but not limited to the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW), AFL-CIO, CLC on behalf of Local 8-0757; (l) federal, state, and local governmental bodies responsible for enforcement of environmental laws and regulations applicable to the leased real property upon which the Debtor operates; (m) the Debtor's real property landlord; (n) all other creditors of the Debtor; and (o) all pension beneficiaries.  The Debtor submits that, under the circumstances, no other or further notice is required.

## NO PRIOR REQUEST

83.     No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE the Debtor respectfully requests that the Court enter an order: (i) approving designation of the Stalking Horse Bidder and related Bid Protections; (ii) approving the Bidding Procedures; (iii) approving the Assumption and Assignment Procedures; (iv) approving the form and manner of notice of all procedures, protections, schedules, and agreements; and (v) scheduling the Sale Hearing. Further, in the event that a Sale Hearing is necessary in accordance with the Bidding Procedures, the Debtor respectfully requests that the Court enter an order: (a) authorizing the sale of the Transferred Assets to the High Bidder pursuant to the Asset Purchase Agreement or Marked Asset Agreement, as the case may be, as the Debtor may enter into prior to the Sale Hearing; (b) authorizing the assumption and assignment of the Debtor Contracts; and (c) grant such other and further relief as is just and proper.

Dated: April 6, 2015
        Wilmington, DE

**CROSS & SIMON, LLC**


 */s/ Michael J. Joyce*
Michael J. Joyce (No. 4563)
Kevin S. Mann (No. 4576)
1105 North Market Street, Suite 901
Wilmington, DE  19801
(302) 777-4200
(302) 777-4224 Facsimile
mjoyce@crosslaw.com
kmann@crosslaw.com

and

(continued to next page)

**McGUIREWOODS LLP**
Michael J. Roeschenthaler (PA 87647)
Frank J. Guadagnino (PA 309768)
EQT Plaza
625 Liberty Avenue, 23rd Floor
Pittsburgh, PA  15222
Telephone: (412) 667-6000
Facsimile: (412) 667-6050
mroeschenthaler@mcguirewoods.com
fguadagnino@mcguirewoods.com

*Proposed Attorneys for the Debtor and
Debtor-in-Possession*

65733271