# Exhibit A

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is dated as of June 3, 2015, by and among **B&P LD ACQUISITION, LLC**, a Delaware limited liability company ("Buyer"), **B&P PROCESS EQUIPMENT & SYSTEMS, LLC**, a Delaware limited liability company ("Guarantor"), and **LITTLEFORD DAY, INC.**, a Delaware corporation ("Seller"). Buyer, Guarantor and Seller are each sometimes hereinafter referred to individually as a "**party**", and collectively as the "parties".

## RECITALS

A.      Seller is engaged in the business of manufacturing, selling and servicing industrial and commercial mixers to various industries including the food and chemical industries (the "Business").

B.      Buyer desires to purchase and acquire, and Seller desires to sell, transfer and assign, certain assets of Seller used in the Business, on the terms and subject to the conditions contained in this Agreement, and in accordance with and subject to the Sale Order, pursuant to sections 105(a) and 363 of the Bankruptcy Code.

Capitalized terms used in this Agreement shall have the meanings specified elsewhere in this Agreement or in Exhibit A.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements of the parties contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE

Section 1.1      Transferred Assets.      Pursuant to sections 105(a) and 363 of the Bankruptcy Code and upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Seller shall sell, transfer, assign and deliver to Buyer, free and clear of all Encumbrances (other than Permitted Encumbrances), and, in reliance upon the representations and warranties of Seller made in Article II, Buyer shall purchase and acquire from Seller, all of Seller's right, title and interest in and to the following tangible and intangible properties, assets and rights used or held for use exclusively in connection with the Business, wherever located (collectively, the "Transferred Assets"):

(a)      all Inventory;

(b)    except for those documents expressly described in <u>Section 1.2(a)</u>, all books, records (including, without limitation, employee records (to the extent they may lawfully be transferred), files, reviews, and other employment documentation and data), files, data, reports and plans of Seller (including such books and records that are contained in computerized storage media), including all mailing lists, customer lists, supplier and vendor lists, price lists, sales records and materials, supplier and vendor data, accounting information and procedures, marketing materials, information and procedures, sales and customer files, advertising and promotional materials, current product material, equipment maintenance records, warranty information, standard forms of documents, and manuals of operations or business procedures;

(c)    any and all telephone numbers, facsimile numbers, email addresses, internet domain names, URLs, and websites used in the Business, remedies against infringements thereof, and rights to protection of interests therein under the laws of all jurisdictions;

(d)    all equipment, machinery, tools, safes, alarm systems, supplies, materials, parts, office equipment and furnishings, furniture and fixtures, other than as expressly designated in <u>Schedule 1.2(m)</u>;

(e)    solely to the extent transferrable under Applicable Law all franchises, approvals, permits, licenses, orders, registrations, certificates, variances and similar rights obtained from Governmental Authorities;

(f)    all Seller Intellectual Property;

(g)    all insurance benefits, arising from or relating to the Transferred Assets prior to the Closing Date but not including the insurance proceeds received for damage to the roof of Leased Real Property;

(h)    all claims of Seller against third parties relating to the Transferred Assets, whether choate or inchoate, known or unknown, contingent or noncontingent; and

(i)    goodwill; and

(j)    all other tangible or intangible properties, assets and rights arising out of or relating to the ownership, use or operation of the Business or the Transferred Assets on or prior to the Closing Date, other than the Excluded Assets.

Notwithstanding the foregoing, the transfer of the Transferred Assets pursuant to this Agreement shall not include the assumption of any Liability related to the Transferred Assets unless Buyer expressly assumes that Liability pursuant to <u>Section 1.3</u>.

<u>Section 1.2</u>    <u>Excluded Assets</u>.    Notwithstanding anything contained herein to the contrary, Seller shall retain and shall not convey to Buyer the following tangible and intangible properties, assets and rights of Seller (collectively the "<u>Excluded Assets</u>") (a) the organizational documents, qualifications to conduct business as a foreign limited liability company, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, share transfer books, blank share certificates and

2293924.3

other documents relating to the organization, maintenance and corporate existence of Seller; (b) cash or cash equivalents of Seller; (c) accounts receivable, (d) all of the Seller Contracts and Leases; (e) all personnel records and other records that Seller is required by law to retain in its possession; (f) all rights in connection with and assets of the Employee Plans; (g) all documents to the extent they relate to any of the Excluded Assets or the Excluded Liabilities or that Seller is required by law to retain; (h) all claims that Seller may have against any Person solely with respect to any other Excluded Assets; (i) all refunds or credits of Taxes due to Seller or its Affiliates by reason of the Seller's ownership of the Transferred Assets prior to Closing; (j) any of Seller's rights or benefits under any of its insurance policies, including without limitation any director and officer fiduciary policies or employment practices policies (in each case of the foregoing, including any tail policies or coverage thereon), and any of Seller's rights, claims, demands, proceedings, causes of action or rights of set off thereunder; (k) any avoidance claims or causes of action under the Bankruptcy Code or applicable state Law; (l) the Purchase Price; and (m) the property and assets expressly designated in Schedule 1.2(m). Notwithstanding anything herein, from the Effective Date until the Closing, the Buyer will be permitted to add any assets of the Seller to Schedule 1.2(m).

Section 1.3    Assumed Liabilities. Upon the terms and subject to the conditions set forth in this Agreement, Buyer shall assume at Closing only the following Liabilities of Seller (collectively, the "Assumed Liabilities"): all liabilities arising out of the conduct and operation of the Business by Buyer or its Affiliates or the ownership of the Transferred Assets by Buyer or its Affiliates after the Closing.

Section 1.4    Excluded Liabilities. Except only for the Assumed Liabilities, Buyer will not assume, and will not pay, discharge, perform or otherwise be liable or responsible for, any Liabilities of Seller of any nature whatsoever (collectively, the "Excluded Liabilities"). The Excluded Liabilities shall remain the sole responsibility of, and shall be retained, paid, performed and discharged by Seller.

Section 1.5    Instruments of Transfer; Cooperation.

(a)    Bill of Sale and Assignment Agreement. At the Closing, Seller shall execute and deliver to Buyer, and Buyer shall execute and deliver to Seller, one or more bills of sale and assignment and assumption agreement substantially in the form attached hereto as Exhibit B (the "Bill of Sale and Assignment Agreement"), and such other assignments and instruments of title (including Intellectual Property and internet domain name assignment agreements) as Buyer may reasonably require for the sale, assignment and transfer of the Transferred Assets to Buyer, individually or in bulk as Buyer may reasonably request.

(b)    Other Instruments of Transfer. At any time and from time to time after the Closing Date but in no event later than the latest of (i) the dismissal or closing of Seller's bankruptcy case, or (ii) ninety (90) days following the Closing Date ("Termination Date for Seller Performance"), without the payment of any further consideration, Seller shall execute and deliver all such further assignments, bills of sale, other instruments of title and transfer and other assurances and documents, and shall take such other action consistent with the terms of this Agreement, as may be requested by Buyer, for the purpose of better or more fully assigning and transferring to Buyer or reducing to Buyer's possession any or all of the Transferred Assets,

including defending title to the Transferred Assets and not challenging Buyer's title to the Transferred Assets following the Closing Date.

(c)    Cooperation.

(i)    Upon the terms and subject to the conditions set forth in this Agreement, Buyer and Seller shall use their respective commercially reasonable efforts to cause the Closing to occur, including taking all reasonable actions necessary to satisfy the conditions set forth in Article VI and complying with all Applicable Laws. Neither Buyer nor Seller shall take any actions that would, or that could reasonably be expected to, result in any of the conditions set forth in Article VI not being satisfied.

(ii)    Seller shall use its commercially reasonable efforts to obtain, and to cooperate with Buyer in obtaining, all consents from third parties (and to provide, and to cooperate with Buyer in providing, all notices to third parties) with respect to any Release of Transferred Assets to the extent such Release of Transferred Assets requires consents or notices as a result of the transactions contemplated by this Agreement or the Ancillary Agreements. If any such consent or notice shall not be obtained or provided at or prior to the Closing (and the Closing occurs) or if any attempted assignment would be ineffective or would impair Buyer's rights with respect to any of the Transferred Assets, then from and after the Closing, Seller shall (A) continue to use its commercially reasonable efforts to obtain any such required consent and provide any required notice as promptly as possible; and (B) cooperate with Buyer in any reasonable arrangement designed to provide the benefits to Buyer of the operation or sale of the Transferred Assets.

(iii)    Each of Seller and Buyer shall keep the other party reasonably apprised of the status of matters relating to completion of the transactions contemplated by this Agreement and the Ancillary Agreements, including promptly furnishing the other with copies of written notices or other written communications received by Buyer or Seller, as the case may be, or any of their respective agents or representatives, from any Governmental Authority with respect to the Contemplated Transactions or from any Person alleging that the consent of such Person is or may be required in connection with the Contemplated Transactions.

(iv)    Seller's obligations under this Section 1.5 shall cease upon the Termination Date for Seller's Performance.

Section 1.6    Purchase Price.

(a)    Purchase Price. The aggregate consideration payable by Buyer to Seller for the Transferred Assets (the "Purchase Price") shall be an amount equal to Four Million Two Hundred Eighty Thousand Dollars ($4,280,000.00).

(b)    Deposit. Prior to the execution of this Agreement, Buyer has made an aggregate payment of One Hundred Ninety Five Thousand ($195,000.00) (the "Deposit") to the Escrow Agent, as escrow agent for the benefit of the Buyer and Seller in accordance with the terms of that certain Escrow Agreement, dated on or about June 1, 2015 (the "Escrow Agreement"), by and among Buyer, Seller and the Escrow Agent.

- 4 -

(c)    Closing Payment.    Not later than 2:00 pm on the Business Day immediately after the Closing Date, Buyer shall pay an amount equal to (i) the Purchase Price, minus (ii) the Deposit, (collectively, the "Closing Payment"), to Seller in immediately available funds by wire transfer to an account designated by Seller in writing to Buyer, which account shall be so designated at least three (3) Business Days prior to the Closing Date.

(d)    [Intentionally Deleted.]

(e)    Allocation of Purchase Price.    The Purchase Price shall be allocated to and among the respective Transferred Assets in the manner to be set forth on a Schedule 1.6(e). Buyer shall prepare and deliver IRS Form 8594 to Seller within forty-five (45) days after the Closing Date to be filed with the IRS. Neither party shall take any position on any Tax Return or other report filed with any Governmental Authority (or in any Proceeding before any Governmental Authority) that is in any manner inconsistent with the allocation to be reflected on Schedule 1.6(e).    The parties shall promptly advise each other of the existence of any Tax audit, controversy or litigation related to any allocation hereunder.

Section 1.7    Limited Guaranty.    Guarantor hereby irrevocably guaranties the full and punctual payment of the Purchase Price if, as and when due and payable by Buyer hereunder.    In furtherance of such limited guaranty, Guarantor hereby agrees to contribute to the capital of Buyer prior to or concurrently with the Closing an amount equal to the ultimate Purchase Price to be paid by Buyer if it is the prevailing bidder in the Auction.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES
## OF SELLER

To induce Buyer to enter into this Agreement and the Ancillary Agreements and to consummate the transactions contemplated hereby and thereby, Seller does, as of the date hereof and as of the Closing Date, make the representations and warranties set forth in this Article II, except as set forth in the disclosure schedules delivered by Seller to Buyer on the date hereof (each, a "Schedule" and collectively, the "Disclosure Schedules").    The Disclosure Schedules set forth matters the disclosure of which is necessary or appropriate either in response to an express disclosure requirement contained in a provision of this Agreement or as an exception to one or more of the representations and warranties of Seller contained in this Article II.    The Disclosure Schedules shall be arranged in paragraphs corresponding to the numbered and lettered sections and paragraphs contained in this Article II.    Any event, item or matter disclosed in any lettered section or paragraph of the Disclosure Schedules shall be deemed to be disclosed with respect to every other representation and warranty in this Article II to the extent any description of facts regarding the event, item or matter disclosed is adequate so as to make reasonably apparent on its face, without reference to any external information, that such event, item or matter is applicable to such other representations or warranties.    Any information that is set forth in, or attached to, the Disclosure Schedules, whether in response to an express requirement, as an exception to a representation or warranty or for informational purposes, is true, accurate and complete as of the date of the execution of this Agreement and will be true, accurate and complete as of the Closing Date.

- 5 -

Section 2.1    Organization and Good Standing

(a)    Seller is a corporation duly incorporated, organized, validly existing and in good standing under the laws of the State of Delaware, and has full power and authority to own, operate and lease its properties, and to conduct its business as it is now being conducted and proposed to be conducted, and is qualified to transact business as a foreign corporation in each jurisdiction in which the operation of its business or the ownership of its properties requires such qualification subject to the provisions of the Bankruptcy Code and except where the failure to be so qualified would not have a Material Adverse Effect.

(b)    The Stockholders of the Seller are and will be on the Closing Date the record and beneficial owners and holders of the shares owned by each of them. There are no Contracts relating to the issuance, sale or transfer of any equity securities or other securities of Seller.

Section 2.2    Execution and Effect of Agreement.  Subject to the entry of the Sale Order and except for such authorization as is required from the Bankruptcy Court, Seller has the requisite power and authority to enter into, execute and deliver this Agreement and the Ancillary Agreements to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Seller of this Agreement and the Ancillary Agreements to which it is a party, the consummation by Seller of the transactions contemplated hereby and thereby and the performance by Seller of its obligations hereunder and thereunder have been duly and effectively authorized by all necessary action on the part of Seller.  This Agreement has been, and at Closing each of the Ancillary Agreements to which Seller is a party will be, duly executed and delivered by Seller. This Agreement constitutes, and at Closing each of the Ancillary Agreements to which Seller is a party will constitute, a legal, valid and binding obligation of Seller, fully enforceable against Seller in accordance with its terms, except as enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application relating to or affecting the enforcement of creditors' rights and the exercise of judicial discretion in accordance with general principles of equity.

Section 2.3    Restrictions.  Except as set forth on Schedule 2.3, and subject to the entry of the Sale Order and authorization as is required by the Bankruptcy Court, the execution and delivery by Seller of this Agreement and the Ancillary Agreements, the consummation by Seller of the transactions contemplated hereby and thereby and the performance by Seller of its obligations hereunder and thereunder do not and will not (with or without the passage of time or the giving of notice or both) (a) violate or conflict with any of the provisions of the organizational documents of Seller; (b) violate or conflict with the provisions of any Applicable Laws; (c) result in the creation of any Encumbrance (other than Permitted Encumbrances) upon any of the Transferred Assets; or (d) violate or conflict with any provisions of, result in a breach of, give rise to a right of termination, modification or cancellation of, constitute a default of, or accelerate the performance required by, the terms of any agreement, indenture, mortgage, deed of trust, security or pledge agreement, lease, contract, note, bond, license, permit, authorization or other instrument to which Seller is a party or to which Seller or any of the Transferred Assets is subject.

- 6 -

Section 2.4    Consents.  Except as set forth on <u>Schedule 2.4</u> and subject to the entry of the Sale Order, no filing with, or consent, waiver, approval or authorization of, or notice to, any Governmental Authority or any other Person is or will be required to be made or obtained by Seller in connection with the execution and delivery of this Agreement, the Ancillary Agreements or any other document or instrument contemplated hereby or thereby, the consummation of any of the transactions contemplated hereby or thereby or the performance of any of its obligations hereunder or thereunder that have not been obtained by Seller.

Section 2.5    <u>Assets</u>.

(a)    <u>Title to Assets</u>. Except as set forth on <u>Schedule 2.5(a)</u> or as permitted by the Sale Order, Seller has good, valid title to, and is the lawful owner of, or has a valid leasehold interest in, the Transferred Assets, except for which any lease or license shall have terminated in accordance with its terms.  The delivery to Buyer of the Bill of Sale and Assignment Agreement at the Closing shall be sufficient to vest good and valid title to the Transferred Assets in Buyer, free and clear of all Encumbrances other than Permitted Encumbrances.

(b)    <u>Assets Used in the Business</u>.  Except for the Excluded Assets, the Transferred Assets constitute all of the tangible and intangible, real and personal properties, rights, assets and interests used in the Business.

(c)    <u>Location of Tangible Assets</u>.  All of the Transferred Assets are in Seller's possession and control and are located on, or based out of, the Leased Real Property except some rental machines which are in the possession of customers who hold the machines on behalf of the Seller which are listed on <u>Schedule 2.5(c)</u>, and any assets that certain former employees/agents have failed to return to the Seller since their dismissal/termination of employment.

(d)    "<u>Assets are sold on an "As Is, Where Is" Basis</u>.  NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT OR ANY ANCILLARY AGREEMENT TO THE CONTRARY, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS <u>ARTICLE II</u>, SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS (INCLUDING THE ASSETS TO BE TRANSFERRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR OPERATIONS, INCLUDING WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.  BUYER HEREBY ACKNOWLEDGES AND AGREES BY ITS EXECUTION OF THIS AGREEMENT THAT BUYER IS PURCHASING THE TRANSFERRED ASSETS ON AN AS IS," "WHERE IS," AND "WITH ALL FAULTS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

Section 2.6    Financial Statements.  Attached to <u>Schedule 2.6(a)</u> are true, accurate and complete copies of: (i) the compiled balance sheet and related statement of income, cash flows and changes in members' equity of Seller as of December 31, 2013 and 2014 and for the fiscal years then ended (collectively, the "<u>Financial Statements</u>"); and (ii) the draft unaudited balance sheet of Seller as of February 28, 2015 (the "<u>Balance Sheet Date</u>") and related interim statements

of income and cash flows for the two (2)-month period then ended (the "Interim Financial Statements". All of the Financial Statements have been prepared in accordance with GAAP and the Interim Financial Statements have been prepared in conformity with GAAP (except for the absence of footnote disclosures and customary year-end adjustments) and have been prepared in a manner consistent with each other and the books and records of Seller, and fairly present the financial condition, results of operations, cash flow and changes in members' equity of Seller as of the dates and for the periods indicated therein.

Section 2.7    No Undisclosed Liabilities.  Seller does not have any Liability required by GAAP to be disclosed on a balance sheet except (a) Liabilities to the extent expressly identified, reflected and reserved against on the face of the Financial Statements (rather than in any notes thereto); or (b) Liabilities incurred since the Balance Sheet Date by Seller in the ordinary course of its business or as a result of restructuring efforts.

Section 2.8    Litigation.  Except as identified on Schedule 2.8, there is no Proceeding pending, or, to the Knowledge of Seller, threatened, nor is there any judgment, order, injunction, decree, stipulation or award rendered, by or before any arbitrator or Governmental Authority, against or affecting Seller or the Transferred Assets.

Section 2.9    Employment Matters.

(a)    Schedule 2.9(a) contains a complete and accurate list of the current employees and their respective job title.

(b)    To the Knowledge of Seller, no officer, director, agent, employee, consultant, or contractor of Seller is bound by any Contract that purports to limit the ability of such officer, director, agent, employee, consultant, or contractor (i) to engage in or continue or perform any conduct, activity, duties or practice relating to the business of Seller or (ii) to assign to Seller or to any other Person any rights to any invention, improvement, or discovery. No former or current employee of Seller is a party to, or is otherwise bound by, any Contract that in any way adversely affected, affects, or will affect the ability of Seller or Buyer to conduct the business as heretofore carried on by Seller.

(c)    Other than the obligations set forth in the Seller's collective bargaining agreement with the collective bargaining agent of its employees or as otherwise disclosed in Schedule 2.9(c), Seller does not have any contractual obligation to pay any employees, contractors or other service providers of Seller any severance benefits in connection with their termination of employment or service. Seller is in material compliance with all Applicable Law respecting employment, employment practices, terms and conditions of employment, employee safety and health and wages and hours. To the Knowledge of Seller, there are no labor relations problems being experienced by Seller including any union organization activities, threatened or actual strikes or work stoppages, actions, suits, complaints, material grievances, unfair labor practice charges or arbitration proceedings. Seller will comply with all requirements as may exist under the national Labor Relations Act to engage in collective bargaining with the collective bargaining representative of its employees regarding termination of employment.  Seller will comply with any and all WARN Act or similar laws requiring timely notice to employees relating to any mass layoff or termination of employment.

- 8 -

Section 2.10    Leased Real Property.  Schedule 2.10 sets forth the address of each parcel of Leased Real Property and a copy of each leasehold or subleasehold estate or other right to use or occupy each such Leased Real Property (the "Leases").

Section 2.11    Seller Contracts.

(a)    Schedule 2.11(a) contains an accurate and complete list of all material unexpired Seller contracts as of the date hereof, and Seller has delivered or made available to Buyer accurate and complete copies, of same, including reasonably complete details concerning such Contracts, including the parties to the Contracts.

(b)    [Intentionally Deleted.]

Section 2.12    Tax Matters.

(a)    All Taxes Paid.  Except as set forth in Schedule 2.12(a), Seller has timely filed or will timely file all federal, state, local and other Tax Returns required to be filed by it under Applicable Laws, including estimated Tax Returns and reports, and has paid all required Income Taxes and other Taxes (including any additions to taxes, penalties and interest related thereto) due and payable by Seller on or before the Closing Date.  All such Tax Returns are true, complete and correct in all material respects. Seller has paid, withheld or accrued on the face of the Financial Statements (rather than in any notes thereto) any and all Income Taxes and other Taxes payable by Seller in respect of the conduct of the Seller's business, the operation of the Business, or the ownership or use of the Transferred Assets and in respect of any transactions for all periods (or portions thereof) through the close of business on the Closing Date.  Seller has withheld and paid over all Taxes required to have been withheld and paid over, and complied with all information reporting and backup withholding requirements, including the maintenance of required records with respect thereto, in connection with amounts paid or owing to any Employee, creditor, independent contractor or other Person.  There are no Encumbrances on any of the assets, rights or properties of Seller with respect to Taxes, other than liens for Taxes not yet due and payable.  Schedule 2.12(a) lists the jurisdictions in which all such Tax Returns have been filed and the Tax periods covered.

(b)    Audits; No Deficiencies Asserted Against Seller.  There are no reviews of any Tax Returns or audits in process, pending or, to the Knowledge of Seller, threatened (either in writing or orally, formally or informally) by any Tax Authority.  No deficiencies have been asserted (or are expected to be asserted) against Seller as a result of IRS (or state or local Tax Authority) examinations.

(c)    Copies of Tax Returns.  Seller has delivered to Buyer true, accurate and complete copies of all Tax Returns filed by Seller for the three (3) most recent taxable years for which such Tax Returns have been filed immediately preceding the date hereof.

(d)    Seller does not have nexus, and has not taken any action that could result in Seller having nexus, for any Tax purpose in any jurisdiction other than jurisdictions for which Tax Returns have been duly filed.

Section 2.13    Compliance With Laws.  Seller has not received any notice of any claimed violation of any Applicable Laws, and no Proceeding has been filed or commenced against Seller alleging failure to so comply.

Section 2.14    Licenses and Permits.    Schedule 2.14 sets forth a true, accurate and complete list of all licenses, permits, and other governmental consents, certificates, approvals and other authorizations (the "Permits") necessary for the operation of the Business as presently conducted, all of which Seller has obtained and currently possesses.

Section 2.15    Brokers.  Seller has not engaged any broker or finder in connection with the Contemplated Transactions.

Section 2.16    Intellectual Property.

(a)    Schedule 2.16(a) sets forth a complete and accurate list of all registered and applications to register Patents, Trademarks, Copyrights and Domain Names owned by Seller.

(b)    Seller is the sole and exclusive owner of all right, title and interest in and to all Seller Intellectual Property, free and clear of all Encumbrances other than Permitted Encumbrances, and without payment to any Person.  To the Knowledge of Seller, Seller is not in violation of any license, sublicense or agreement with respect to any Seller Intellectual Property, and the consummation of the transaction contemplated by this Agreement will not limit the Buyer's ability to use any Seller Intellectual Property.   All Patent applications, Trademark applications, and Copyright applications that are listed in Schedule 2.16(a) are presently pending except as noted therein.  To the Knowledge of Seller, all issued Patents, Trademark registrations, Copyright registrations and Domain Name registrations that are listed in Schedule 2.16(a) are currently in compliance with formal legal requirements (including payment of filing, examination and maintenance fees and proofs of working or use), are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety (90) days after the Closing Date.

(c)    Seller has not within the last five (5) years (1) received any written notice alleging any infringement, misappropriation, or violation of the Intellectual Property rights of any person (including any claim that Seller must license or refrain from using any Intellectual Property rights of any other Person) or (2) received any written notice alleging unfair trade practices or passing off of counterfeit goods.  To the Knowledge of Seller, no other Person has violated, infringed upon, or misappropriated any of Seller Intellectual Property.   To the Knowledge of Seller, there are no material pending or threatened claims against Seller or any of its employees or agents alleging that any Seller Intellectual Property or any Transferred Asset infringes on or conflicts with the Intellectual Property rights of any other Person.

(d)    Schedule 2.16(d) sets forth, as of the date hereof, all of the licenses relating to the Intellectual Property held under and used by the Seller pursuant to a license that are material to the Business as currently conducted or to the Transferred Assets, other than licenses of commercially available off-the-shelf and downloadable computer software licensed pursuant to shrink-wrap and click-wrap agreements (the "Licensed Intellectual Property").  The

- 10 -

Seller is the licensee under the license agreements relating to the Licensed Intellectual Property, and there are no outstanding or, to the Knowledge of Seller, threatened, disputes with respect to any such license agreements which would be material to the Seller and the Transferred Assets.

(e)    For the purposes of this Agreement, "<u>Intellectual Property</u>" means all (1) inventions (whether patentable or unpatentable and whether or not reduced to practice), and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, divisionals, revisions, extensions, and reexaminations relating thereto (collectively referred to as "<u>Patents</u>"); (2) trademarks, trade names, service marks, trade dress, logos, slogans, and all goodwill associated therewith, together with all applications, registrations, and renewals relating thereto (collectively referred to as "<u>Trademarks</u>"); (3) works of authorship and mask works, all copyrights, and all applications, registrations, and renewals relating thereto (collectively referred to as "<u>Copyrights</u>"); (4) trade secrets and other confidential or proprietary information (including ideas, research and development, know-how, mobile technology expertise, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, patterns, aperture cards/microfeeds, welding templates, bills of material, specifications, customer and supplier lists, pricing and cost information, financial, marketing and business data, and business and marketing plans and proposals) (collectively referred to as "<u>Trade Secrets</u>"); and (5) rights in Internet web sites or protocol addresses, Internet domain names and registration rights, uniform resource locators, related security passwords or codes, and copies and tangible embodiments of the foregoing (in whatever form or medium); and (6) and social media user names and related security passwords or codes (all of subsections (5) and (6) collectively referred to as "<u>Domain Names</u>").

(f)    For the purposes of this Agreement, "<u>Seller Intellectual Property</u>" means all Intellectual Property owned by, or licensed to, the Seller.

<u>Section 2.17</u>    <u>Seller Products</u>.    <u>Schedule 2.17</u> identifies outstanding written notices of claims (if any) received by Seller from its customers relating to the sale, license, lease or delivery of Seller's Products to the customer.  For the purposes of this Agreement, "<u>Seller's Products</u>" means all products or services produced, marketed, licensed, sold, distributed or performed by or on behalf of Seller and all products or services currently under development by Seller.

<u>Section 2.18</u>    <u>Insurance</u>.    Seller maintains the insurance policies set forth on <u>Schedule 2.18</u>, which policies cover the Seller's assets.  Sellers have paid all premiums on such policies as they have come due before and following the commencement of the Seller's bankruptcy case.  Seller has made available to Buyer a true, correct and complete copy of each such insurance policy.

<u>Section 2.19</u>    <u>Employee Plans</u>.    <u>Schedule 2.19</u> sets forth a true and complete list of all Employee Plans or Contracts under which Seller has any present obligations or liability on behalf of its employees or former employees, contractual employees or their dependents or beneficiaries. No proceedings (other than routine benefit claims) are pending or, to the Knowledge of Seller, threatened against or relating to any Employee Plan, or any fiduciary thereof.

<u>Section 2.20</u>    <u>Environmental Matters</u>.  Except as disclosed in Schedule 2.20:

- 11 -

(a)    Seller has no Knowledge of, and has not received a written notice of, any pending or threatened Encumbrances, investigation, suit, claim, action, administrative action, direction, penalty or proceeding arising under or pursuant to any Environmental Law with respect to or affecting the Business or any Facility or any other property or asset (whether real, personal or mixed) in which Seller has or had an interest within the past five (5) years.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BUYER AND GUARANTOR

To induce Seller to enter into this Agreement and the Ancillary Agreements and to consummate the transactions contemplated hereby and thereby, each of Buyer and Guarantor hereby, as of the date hereof and as of the Closing Date, makes the following representations and warranties:

Section 3.1    Organization and Good Standing.    Each of Buyer and Guarantor is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and has full power and authority to own, operate and lease its properties, and to conduct its business as it is now being conducted and proposed to be conducted, and is qualified to transact business as a foreign limited liability company in each jurisdiction in which the operation of its business or the ownership of its properties requires such qualification except where the failure to be so qualified would not have a Material Adverse Effect.

Section 3.2    Execution and Effect of Agreement.    Each of Buyer and Guarantor has the requisite power and authority to enter into, execute and deliver this Agreement and the Ancillary Agreements to which it is a party, to perform its respective obligations hereunder and thereunder, if any, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by each of Buyer and Guarantor of this Agreement and the Ancillary Agreements to which it is a party, the consummation by each of Buyer and Guarantor of the transactions contemplated hereby and thereby and the performance by each of Buyer and Guarantor of its respective obligations hereunder and thereunder, if any, have been duly and effectively authorized by all necessary action on the part each of Buyer and Guarantor.  This Agreement has been, and at Closing each of the Ancillary Agreements to which it is a party will be, duly executed and delivered by Buyer or Guarantor, as applicable.  This Agreement constitutes, and at Closing each of the Ancillary Agreements to which it is a party will constitute, a legal, valid and binding obligation of Buyer or Guarantor, as applicable, fully enforceable against Buyer or Guarantor, respectively, in accordance with its terms, except as enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application relating to or affecting enforcement of creditors' rights and the exercise of judicial discretion in accordance with general principles of equity.

Section 3.3    Restrictions.  The execution and delivery by each of Buyer and Guarantor of this Agreement and the Ancillary Agreements to which it is  party, the consummation by Buyer or Guarantor, as applicable, of the transactions contemplated hereby and thereby and the performance by Buyer or Guarantor, respectively, of its obligations hereunder and thereunder, if any,  will not (a) violate or conflict with any of the provisions of the organizational documents of Buyer or Guarantor; (b) or the laws of the jurisdiction in which Buyer or Guarantor is organized;

- 12 -

(c) violate any provision of Applicable Law, or any order, writ, injunction, judgment or decree of any court or governmental authority applicable to Buyer or Guarantor; or (d) violate or result in a breach of or constitute an event of default under any Contract to which Buyer or Guarantor is a party or by which Buyer or Guarantor is bound.

Section 3.4    No Consents.    No filing with, or consent, waiver, approval or authorization of, or notice to, any Governmental Authority or any other Person is or will be required to be made or obtained by Buyer or Guarantor in connection with the execution and delivery of this Agreement, the Ancillary Agreements to which it is a party, or any other document or instrument contemplated hereby or thereby, the consummation of any of the transactions contemplated hereby or thereby or the performance of any of its obligations hereunder or thereunder that have not been obtained by Buyer or Guarantor, respectively.

Section 3.5    Sufficiency of Funds.    Guarantor has and shall contribute to the capital of Buyer sufficient funds to pay the Purchase Price if, as and when due.    Buyer shall have at the Closing sufficient funds to enable Buyer to consummate the purchase of the Transferred Assets from Seller on the terms set forth herein and otherwise to perform all of the Buyer's obligations under this Agreement and the Ancillary Agreements.    There is no financing contingency to Buyer's purchase of the Transferred Assets.

Section 3.6    Litigation.    There is no action, suit, proceeding or claim that is pending or to Buyer or Guarantor's Knowledge, threatened in any court or by or before any Governmental Authority that would adversely affect Buyer or Guarantor's ability to perform its obligations under this Agreement on a timely basis.

**ARTICLE IV**
**COVENANTS AND AGREEMENTS OF SELLER AND BUYER**

Section 4.1    Access to Information; Transferred Assets.    Except as prohibited or limited by Applicable Law, Seller shall, from and after the date of this Agreement and until the Closing Date, (a) give any member of the Buyer Group full and complete access upon reasonable notice during normal business hours, to all of the Transferred Assets and the officers, directors, managers, employees, offices, properties, agreements, records, contracts, documents, business and affairs of Seller and the Business and (b) provide copies of such information concerning Seller, the Business and the Transferred Assets as Buyer may reasonably request.    Immediately following the Closing, Seller shall provide Buyer full and unconditional access to the Transferred Assets in order to take possession of the Transferred Assets.    Following the Closing Date and for a period of one (1) year thereafter, or for a period required by Applicable Law, whichever is longer, Seller shall retain all books and records, to the extent relating to the operation of the Business during the period up to the Closing Date, that are not included in the Transferred Assets and shall, upon reasonable written request delivered to Seller, afford to members of the Buyer Group reasonable access during normal business hours to any and all such books and records and permit them to make copies of all such books and records.

- 13 -

Section 4.2    Conduct of Business Prior to Closing.  From the date hereof through the Closing Date:

(a)    Seller shall maintain the Transferred Assets in substantially the same condition and repair as of the date of the Bidding Procedures Order;

(b)    Seller shall maintain the Leased Real Property and the Improvements and as may be required for the normal operations of the Business and to comply with Applicable Laws;

(c)    Seller shall not sell, assign, transfer or otherwise dispose of any Transferred Asset (or any right, title or interest therein), other than the sale of Inventory to customers of Seller in the Ordinary Course of the Business;

(d)    Seller shall not terminate any Employee other than for cause; provided, however, that if Seller desires to terminate an Employee for cause at the level of a manager or above, then the Seller shall first obtain the written approval of Buyer before terminating such Employee;

(e)    Seller shall not create, authorize or suffer to exist any new Encumbrance on any Transferred Asset (other than Permitted Encumbrances); and

(f)    Seller shall continue to store and maintain any and all equipment drawings and designs in their current room of the Facility located at 7451 Empire Drive, Florence, KY 41042, and Seller shall not permit any Person to enter or otherwise have any access whatsoever to such room without the prior consent of Buyer;

(g)    Seller shall not increase in any manner the compensation of, or enter into any new bonus or incentive agreement or arrangement with, any Employee.

Section 4.3    [Intentionally Deleted.]

Section 4.4    [Intentionally Deleted.]

Section 4.5    Bankruptcy Court Filings.

(a)    Seller shall use its commercially reasonable efforts to pursue the entry of the Sale Order.  Seller shall use commercially reasonable efforts to comply (or obtain an order on orders from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules in connection with obtaining entry of the Sale Order.  Seller shall consult with Buyer and its Representatives concerning the Sale Order, and any other orders of the Bankruptcy Court relating to the transactions contemplated herein, and the bankruptcy proceedings in connection therewith, and provide Buyer with copies of applications, pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable.

(b)    Buyer agrees that it will take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other

- 14 -

documents or information for filing with the Bankruptcy Court, and appearing as a witness at any such hearing to consider approval of the Sale Order, for the purposes, among others, of demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code; provided, however, in no event shall Buyer or Seller be required to agree to any amendment of this Agreement.

(c)     Seller shall use its commercially reasonable efforts to have the Bankruptcy Court enter the Sale Order on or before June 8, 2015.

(d)     The Sale Motion shall be served on all parties in interest in the bankruptcy case including (i) all creditors, (ii) all equity interest holders, (iii) the Pension Benefit Guaranty Corporation, (iv) the Unites States Trustee, (v) all parties to any labor contract, including but not limited to the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW), AFL-CIO, CLC on behalf of Local 8-0757, (vi) federal, state, and local governmental bodies responsible for enforcement of environmental laws and regulations applicable to the Leased Property, (vii) all federal, state and local taxing authorities with jurisdiction over the Seller, its assets or its business operations, (viii) the Landlord for the Leased Real Property, (ix) all parties asserting a Lien on or a claim to any of the Transferred Assets and (x) all parties in interest or creditors otherwise required to be served pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.

(e)     The Sale Order will provide, among other things, that pursuant to sections 105 and 363 of the Bankruptcy Code:

(i)     the Transferred Assets shall be sold to Buyer free and clear of all liens, claims, interests, and encumbrances, including without limitation, Liens as defined herein, of any type whatsoever (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability) (except for Permitted Encumbrances), and the Assumed Liabilities shall be assumed by Buyer, in each case, pursuant to this Agreement,

(ii)     Buyer shall be found to be a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code,

(iii)     Buyer shall have no liability or responsibility for any Liability or other obligation of Seller arising under or related to the Transferred Assets other than as expressly set forth in this Agreement, including successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, for purposes of clarity, the Buyer shall have no successor liability under any collective bargaining agreement, contract with any union or under any pension plan or other employee benefit plan under which Seller is an obligor or a party, and

- 15 -

   (iv) Buyer shall have no Liability for any Excluded Liability.

In the event the Sale Order is appealed, Seller and Buyer shall use their respective commercially reasonable efforts to defend such appeal at their own cost and expense.

   (f) Seller further covenants and agrees that, after the entry of the Sale Order, the terms of any reorganization or liquidation plan it submits to the Bankruptcy Court, or any other court for confirmation or sanction, shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the Contemplated Transactions.

   (g) Notwithstanding any other term hereof, the parties acknowledge and agree that this Agreement is subject to all of the terms and conditions of the Bidding Procedures Order. Without limiting the generality of the foregoing and subject to the Bidding Procedures, each of Buyer and Guarantor expressly acknowledges and agrees that the initial execution and submission of this Agreement by the Buyer constitutes its irrevocable offer to purchase the Transferred Assets and to otherwise consummate the transactions contemplated hereby on the terms and conditions set forth herein and the irrevocable offer of Guarantor set forth in Section 1.7.

   Section 4.6  [Intentionally Deleted.]

   Section 4.7  Recent Developments.  From and after the date of this Agreement through the Closing Date, Seller shall promptly notify Buyer of the occurrence of any facts or circumstances, the disclosure of which would have been required pursuant to the representations and warranties contained in Article II if such facts or circumstances had been known to it prior to the execution of this Agreement, and of any other matters that would cause any representation or warranty to be untrue, incorrect or misleading in any respect.  Nothing contained in this section shall be deemed to be a waiver of any obligation of Seller to disclose any information in accordance with the terms of this Agreement, nor shall it be deemed to be a waiver of any right of Buyer under the terms of this Agreement.  Any notification by Seller of the occurrence of any facts or circumstances that would have been required to have been disclosed in the Disclosure Schedules at the time this Agreement was executed shall not relieve Seller from any Liability to which each of such parties may be subject by reason of its failure to have made such disclosure in the original Disclosure Schedules.

   Section 4.8  Restrictive Covenants.

   (a) [Intentionally Deleted.]

   (b) Confidential Information.  From and after the Closing Date, Seller shall not, and shall cause its respective Affiliates not to, directly or indirectly, use for any purpose or disclose to any Person any confidential or proprietary information concerning Seller, the Transferred Assets, the Business, or Seller's suppliers, vendors or customers, including information, whether written or otherwise, regarding the litigation, customers, customer lists, costs, prices, earnings, systems, operating procedures, prospective and executed contracts and other business arrangements, and sources of supply.

Section 4.9    No Successor.  Nothing in this Agreement or any Ancillary Agreement shall create any implication, covenant, or commitment that Buyer is a successor or successor-in-interest to Seller or the Business.

Section 4.10    Continuation of Phone and Internet Services.  Seller agrees to continue telecommunications (including telephone and internet) services at the Leased Real Property in effect prior to the Closing Date for a period of up to sixty (60) days thereafter.  Buyer shall reimburse Seller for the actual third-party invoice cost thereof within ten (10) days after receipt of invoices therefor.

# ARTICLE V
## COVENANTS AND AGREEMENTS OF THE PARTIES

Section 5.1    Access to Information.  Until the second anniversary of the Closing Date, Buyer shall provide Seller, at Seller's sole cost and expense, with access, upon reasonable notice and during normal business hours, to all records of the Seller that relate to the ownership or operation of the Transferred Assets prior to the Closing Date, for any proper purpose, including in connection with the preparation of any tax returns, tax elections or financial statements or in connection with any judicial, quasi-judicial, administrative, tax, audit or arbitration proceeding.

Section 5.2    Employees.

(a)    Buyer and Seller hereby acknowledge that Buyer shall have no obligation to hire or employ or extend any offer to any Employee.  Notwithstanding the foregoing, however, subsequent to the date hereof, Buyer shall be free to discuss and negotiate with, hire or employ any of the Employees as it desires and on such terms as it may reach with such Employees in Buyer's sole discretion.  From and after the date of this Agreement, Seller shall fully cooperate with Buyer and provide any assistance reasonably requested by Buyer in connection with Buyer's employment or attempts to employ any Employees or otherwise in connection with the employment matters contemplated by this Agreement, including providing Buyer with reasonable access to the current Employees (including for purposes of conducting interviews) and those employment records requested by Buyer which Seller may lawfully provide to Buyer.  Subject to Applicable Law and this Agreement, Buyer shall have a right to dismiss any Employee at any time, with or without cause, and to change the terms of employment of any Employee.  Nothing in this section is intended to, and this section does not, confer any rights or remedies upon any Person other than Buyer and Seller.

(b)    Except as specified in this Agreement or otherwise agreed in writing by Buyer and/or the Buyer Group, neither shall be obligated to provide any severance, separation pay, or other payments or benefits to any employee of Seller on account of any termination of such employee's employment on or before the Closing Date, and such payments and benefits (if any) shall remain obligations of the Sellers to be addressed in the bankruptcy case.

(c)    Collective Bargaining Matters.  Buyer will set its own initial terms and conditions of employment for the employees and others it may hire, including work rules, benefits and salary and wage structure, all as permitted by law. Buyer will not assume any

- 17 -

collective bargaining agreements under this Agreement.  Claims arising from any rejection or modification of the Seller's collective bargaining agreement shall be claims against Seller and its bankruptcy estate.

        (d)      General Employee Provisions.

        (i)      Seller and Buyer shall give any notices required by Applicable Laws and take whatever other actions with respect to the plans, programs and policies described in this Section 5.2 as may be necessary to carry out the arrangements described in this Section 5.2.

        (ii)      Seller and Buyer shall provide each other with such plan documents and summary plan descriptions, employee data or other information as may be reasonably required to carry out the arrangements described in this Section 5.2.

        (iii)      If any of the arrangements described in this Section 5.2 are determined by the IRS or other Governmental Authority to be prohibited by law, Seller and Buyer shall modify such arrangements to as closely as possible reflect their expressed intent and retain the allocation of economic benefits and burdens to the parties contemplated herein in a manner that is not prohibited by law.

        (iv)      Seller shall provide Buyer with completed I-9 forms and attachments with respect to all hired Employees, except for such employees as Seller certifies in writing to Buyer are exempt from such requirement.

        (v)      Except as otherwise provided in this Agreement, Buyer shall not have any responsibility, liability or obligation, whether to Employees, former employees, their beneficiaries or to any other Person, with respect to any employee benefit plans, practices, programs or arrangements maintained by Seller.

        Section 5.3      Consents and Approvals.  Each of Seller and Buyer shall use its respective commercially reasonable efforts to obtain, and to cooperate with the other party in obtaining, all consents, approvals, waivers and authorizations from Governmental Authorities, lenders, or otherwise (and to provide, and cooperate with the other party in providing, notices to such Persons) whose consent, approval, waiver or authorization is reasonably necessary or advisable in order to consummate the transactions contemplated hereby or for the operation of the Business by Buyer from and after Closing.

        Section 5.4      Claims.  In the event a Claim is brought against Seller by any Person relating to the transactions contemplated by this Agreement or any of the Ancillary Agreements, Buyer shall have the right, at its own expense, to employ its own counsel and to participate in the litigation, negotiation and settlement of such Claim.

        Section 5.5      Casualty and Condemnation.  Subject to Section 6.1(a), if the Transferred Assets or Leased Real Property are materially damaged by casualty (or a material portion of such Leased Real Property is taken or subject to a pending or threatened condemnation action) prior to Closing, Seller shall either (i) repair or replace the Transferred Assets or repair the Leased Real

- 18 -

Case 15-10722-KG    Doc 134-1    Filed 06/04/15    Page 20 of 40

Property to substantially the same condition as such asset existed before such casualty or (ii) transfer and assign, at Closing, all insurance or condemnation proceeds received (together with an assignment of the right to receive any proceeds not yet paid) to Buyer or (iii) terminate the Agreement in accordance with Section 8.1.

Section 5.6    Removing Transferred Assets.

(a)    Throughout the two (2) month period immediately following the Closing, Seller shall give Buyer reasonable daily access to all Facilities and other Leased Real Property in accordance with the applicable lease and provide Buyer with such utilities as it may reasonably require and such other services as are listed on Schedule 5.6 so as to allow Buyer to remove all Transferred Assets from such Facilities and other Leased Real Property. Such removal shall be done in such manner as is commercially reasonable to minimize any damage to the Facilities and other Leased Real Property and any disruption of the liquidation operations to be conducted by Seller after the Closing. Any damage to the Facilities or other Leased Real Property resulting from such removal shall be (i) repaired by Buyer or its agents, or (ii) paid by Buyer after the expiration of such two (2) month period. Should Buyer fail to remove all of the Transferred Assets within such two (2) month period, Seller shall have the right, but not the obligation, (i) to remove the remaining Transferred Assets at Buyer's sole, but commercially reasonable, cost and expense; (ii) to store such Transferred Assets and to charge Buyer all commercially reasonable storage costs associated therewith; (iii) to treat such Transferred Assets as unclaimed and to proceed to dispose of the same under the laws governing unclaimed property; or (iv) to exercise any other right or remedy conferred by this Agreement or otherwise available at law or in equity. Buyer shall promptly reimburse Seller for all commercially reasonable costs and expenses incurred by Seller in connection with any Transferred Assets not timely removed by Buyer.

(b)    Seller shall indemnify, defend with counsel reasonably satisfactory to Buyer, and hold Buyer and it and its Affiliates officers, managers, employees and agents harmless from and against any and all losses, damages, suits claims, demands costs and charges any of them may incur (including reasonable attorneys' fees incurred in connection therewith or in enforcing this indemnification obligation) by reason of (i) Seller's breach of this Section 5.6 or (ii) the malfeasance, misfeasance or nonfeasance of Seller or any of its or its Affiliates officers, managers, employees and agents in respect to the Persons exercising Buyer's rights under this Section 5.6.

(c)    Except as contemplated by Section 5.6(b), Buyer shall indemnify, defend with counsel reasonably satisfactory to Seller, and hold Seller and it and its Affiliates officers, directors, employees and agents harmless from and against any and all losses, damages, suits claims, demands costs and charges any of them may incur (including reasonable attorneys' fees incurred in connection therewith or in enforcing this indemnification obligation) arising out of access to the Leased Real Property and removal of Transferred Assets in respect of Buyer's exercising its rights under this Section 5.6.

(d)    The parties acknowledge that Seller will take into account the potential costs associated with removal of Excluded Assets when determining the prevailing bidder at the Auction.

- 19 -

(e)     Prior to entering the Leased Real Property, Buyer shall provide to Seller proof of current insurance in form and an amount acceptable to Seller in its reasonable discretion.

Section 5.7    Reports and Returns.  Seller shall promptly after the Closing prepare and file all reports and returns required by Applicable Laws relating to the business of Seller as conducted using the Transferred Assets, to and including the Closing Date.

Section 5.8    Customer and other Business Relationships.  After the Closing, Seller will cooperate with Buyer in its efforts to continue and maintain for the benefit of Buyer those business relationships of Seller existing prior to the Closing and relating to the business to be operated by Buyer after the Closing, including relationships with employees, regulatory authorities, licensors, customers, suppliers and others, and Seller will satisfy the Excluded Liabilities in a manner that is not complies with the Bankruptcy Code. Seller will refer to Buyer all inquiries relating to such business. Neither Seller nor any of its officers, employees, agents or shareholders shall take any action that would tend to diminish the value of the Transferred Assets after the Closing or that would interfere with the business of Buyer to be engaged in after the Closing, including disparaging the name or business of Buyer.

Section 5.9    Cooperation of Buyer.  Buyer shall take, or cause to be taken, all commercially reasonable actions, consistent with Applicable Law, to consummate and effectuate as soon as possible the transactions contemplated hereby.

## ARTICLE VI
## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

Section 6.1    Conditions to the Obligations of Buyer and Guarantor.  The obligations of Buyer and Guarantor to consummate the transactions contemplated hereby at the Closing and of Buyer to perform its other obligations under this Agreement that are to be performed at and after the Closing, are subject to the satisfaction at or prior to the Closing of the conditions precedent set forth in this section (unless any such condition shall be waived in writing by Buyer):

(a)     No Material Adverse Effect.  There shall have been no Material Adverse Effect with respect to the Transferred Assets.

(b)     Consents and Approvals Obtained.  Subject to Section 5.11, Seller shall have obtained, prior to the Closing, all consents, approvals, waivers and authorizations from Governmental Authorities, lenders and other third parties whose consent, approval, waiver or authorization is reasonably necessary or advisable in order to consummate the transactions contemplated hereby, including the consents and approvals set forth on Schedule 2.4.

(c)     Representations and Warranties True.  Each of the representations and warranties of Seller contained in this Agreement that is qualified by materiality shall be true and correct on and as of the Closing Date with the same effect as though made on and as of the Closing Date (except with respect to those representations and warranties that speak as of a specified date other than the Closing Date, which shall be true and correct only as of such

specified date). Each of the representations and warranties that is not so qualified by materiality shall be true and correct in all material respects on and as of the Closing Date as if made on and as of the Closing Date (except with respect to those representations and warranties that speak as of a specified date other than the Closing Date, which shall be true and correct in all material respects only as of such specified date).

(d)    <u>Compliance with Agreement</u>.  Seller shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date.

(e)    <u>No Injunctions or Restraining Orders; Claims</u>.  There shall have been no injunction, restraining order or decree, or Proceeding of any nature whatsoever that is in effect or threatened that restrains or prohibits the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements.

(f)    <u>Closing Documentation</u>.  Seller shall have executed and delivered or caused to be executed and delivered to Buyer at the Closing the following:

(i)    the Bill of Sale and Assignment Agreement duly executed by Seller;

(ii)    [Intentionally Deleted;]

(iii)    a Certificate of the secretary of Seller, dated the Closing Date, certifying (A) that attached thereto are true and complete copies of (1) the resolutions of Seller that authorize the execution and delivery by Seller of this Agreement and the consummation of the transactions contemplated hereby by Seller; (2) the organizational documents of Seller as in effect as of the date of such certification; and (3) a good standing certificate of Seller from the jurisdiction in which Seller was formed or incorporated dated no fewer than ten (10) days before Closing; and (B) the identity and incumbency of the officers, directors and managers of Seller who have executed or will execute this Agreement or any of the Ancillary Agreements;

(iv)    a Certificate of the president, chief executive officer, or chief restructuring officer of Seller, dated the Closing Date, certifying that the conditions set forth in Sections 6.1(c) and 6.1(d) have been satisfied;

(v)    evidence in writing reasonably satisfactory to Buyer that Seller has, concurrently with the Closing, (i) changed its name so as not to include the terms "Littleford" or "Day" or any derivative or part thereof, and has made all filings in the State of Delaware and each jurisdiction in which Seller is qualified to do business, to reflect such name change (it being understood and agreed that Buyer shall be authorized and entitled to file all such documents following the Closing if not done so by Seller), and (ii) changed its name with regard to the bankruptcy case caption so as not to include the terms "Littleford" or "Day" or any derivative or part thereof; and

2293924.3

(vi)    such other documents, instruments or agreements as may reasonably be requested by Buyer to effect the transactions contemplated by this Agreement or the Ancillary Agreements.

(g)    All requisite notice periods under the Warn Act or similar laws requiring timely notice to employees shall have expired.

(h)    The Bankruptcy Court shall have approved the Bidding Procedures and entered the Sale Order with no modifications materially adverse to Buyer, in its reasonable discretion, and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

Section 6.2    Conditions to the Obligations of Seller.    The obligations of Seller to consummate the transactions contemplated by this Agreement at the Closing and to perform its other obligations under this Agreement that are to be performed at and after the Closing, are subject to the satisfaction at or prior to the Closing of the conditions precedent set forth in this section (unless any such condition shall be waived in writing by Seller):

(a)    Consents and Approvals Obtained.    Buyer shall have obtained, prior to the Closing, all consents, approvals, waivers and authorizations from Governmental Authorities, lenders and other third parties whose consent, approval, waiver or authorization is reasonably necessary or advisable in order to consummate the transactions contemplated hereby.

(b)    Representations and Warranties True.    Each of the representations and warranties of Buyer and Guarantor contained in this Agreement that is qualified by materiality shall be true and correct on and as of the Closing Date with the same effect as though made on and as of the Closing Date, and each of the representations and warranties that is not so qualified by materiality shall be true and correct in all material respects on and as of the Closing Date as if made on and as of the Closing Date.

(c)    Compliance with Agreement.    Each of Buyer and Guarantor shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Buyer or Guarantor, respectively, on or prior to the Closing Date, including, without limitation, tendering the Purchase Price referenced in Section 1.6.

(d)    No Injunctions or Restraining Orders; Claims.    There shall have been no injunction, restraining order or decree, or Proceeding of any nature whatsoever that is in effect or threatened that restrains or prohibits the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements.

(e)    Closing Documentation.    Buyer shall have executed and delivered or caused to be executed and delivered to Seller at the Closing the following:

(i)    the Closing Payment;

(ii)    the Bill of Sale and Assignment Agreement duly executed by Buyer;

- 22 -

2293924.3

(iii)    [Intentionally Deleted;]

(iv)    a certificate of the president, chief executive officer, or manager of Buyer, dated the Closing Date, certifying that the conditions set forth in <u>Sections 6.2(b)</u> and <u>6.2(c)</u> have been satisfied; and

(v)    such other documents, instruments or agreements as may reasonably be requested by Seller to effect the transactions contemplated by this Agreement or the Ancillary Agreements.

(vi)    The Bankruptcy Court shall have approved the Bidding procedures and entered the Sale Order with no modifications materially adverse to Buyer, in its reasonable discretion, and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

## ARTICLE VII
## CLOSING

Section 7.1    Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of McGuireWoods, 625 Liberty Avenue, 23rd Floor, Pittsburgh, Pennsylvania 15222, at 10:00 a.m., Eastern Standard Time, within five (5) Business Days following entry of the Sale Order (the "Closing Date"), or at such other place and at such other time and date as may be mutually agreed upon in writing by Buyer and Seller provided, however, that any party can participate remotely by electronic delivery of documents and/or funds.  All proceedings being taken and all documents being executed and delivered by the parties shall be deemed to have been taken and executed simultaneously, and no proceedings shall be deemed taken nor any documents executed or delivered until all have been taken, executed or delivered.  The Closing shall be effective at 12:01 a.m., Eastern Standard Time, on the Closing Date.

## ARTICLE VIII

## TERMINATION

Section 8.1    Events of Termination.  This Agreement may, prior to the Closing, be terminated by the parties hereto only as follows:

(a)    by the mutual written consent of Seller and Buyer;

(b)    by Buyer upon written notice to Seller (the "Buyer Termination Notice") in the event that (i) any representation or warranty made by Seller in or pursuant to this Agreement shall be inaccurate or untrue in any material respect; or (ii) Seller breaches or fails to perform or comply with any covenant or agreement to be performed or complied with by Seller, in or pursuant to this Agreement in any material respect prior to or at the Closing;  provided, however, that in the case of any matters set forth in clauses (i) or (ii) above, Seller shall have fifteen (15) days (the "Seller Cure Period") from the date on which Seller received the Buyer

Termination Notice during which to cure any matter that is capable of being cured and if such matter is not so cured to the reasonable satisfaction of Buyer by the expiration of the Seller Cure Period, this Agreement shall be terminated in accordance with the Buyer Termination Notice;

(c)     by Seller upon written notice to Buyer (the "Seller Termination Notice") in the event that (i) any representation or warranty made by Buyer or Guarantor in or pursuant to this Agreement shall be inaccurate or untrue in any material respect; (ii) Buyer or Guarantor breaches or fails to perform or comply with any covenant or agreement to be performed or complied with by Buyer in or pursuant to this Agreement in any material respect prior to or at the Closing; (iii) a casualty or condemnation to a Transferred Asset has occurred; or (iv) prior to the Auction as provided for in the last paragraph of Section 1.1; provided, however, that in the case of any matters set forth in clauses (i) or (ii) above, Buyer shall have fifteen (15) days (the "Buyer Cure Period") from the date on which Buyer received the Seller Termination Notice during which to cure any matter that is capable of being cured and if such matter is not so cured to the reasonable satisfaction of Seller by the expiration of the Buyer Cure Period, this Agreement shall be terminated in accordance with the Seller Termination Notice;

(d)     by Seller or Buyer, upon written notice to the other party, if the Closing has not occurred on or before June 30, 2015, unless the failure to consummate the Closing is the result of a breach or violation of this Agreement by Seller (if Seller is the party seeking to terminate this Agreement) or Buyer or Guarantor (if Buyer is the party seeking to terminate this Agreement); or

(e)     by Buyer, if Seller's bankruptcy case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement.

Section 8.2     Consequences of Termination.

(a)     Upon termination of this Agreement pursuant to the provisions of Section 8.1, this Agreement shall immediately become null and void and of no further force and effect, and there shall be no further obligation of any party (except as set forth in this section and in Sections 4.3, 4.4, 4.8(b), 10.1, 10.7 and 10.8, all of which shall survive such termination); provided, however, that nothing in this section shall relieve any party from any Liability to which such party may be subject arising out of or related to any misrepresentation or breach of this Agreement by such party that occurs on or before termination hereof.  The obligations of the parties set forth in that certain Confidentiality Agreement, dated April 16, 2015, by and between Buyer and Seller, shall survive the termination of this Agreement.

(b)     Nothing contained herein shall preclude Buyer or Seller from seeking to specifically enforce the terms of this Agreement in the event of any breach of this Agreement, and the parties have agreed that both parties shall be entitled to the remedy of specific performance in addition to all other remedies that may be available as a result of such breach. Seller shall also have the right to retain the Deposit in the event of a breach of this Agreement by Buyer.

## ARTICLE IX
## INDEMNIFICATION; REMEDIES

Section 9.1    [Intentionally Deleted.].

Section 9.2    [Intentionally Deleted.]

Section 9.3    [Intentionally Deleted.]

Section 9.4    [Intentionally Deleted.]

Section 9.5    Survival of Representations, Warranties, Covenants and Agreements.

(a)    Survival of Representations and Warranties.  The representations and warranties contained in or made pursuant to this Agreement shall survive until the Closing.  The foregoing limitations on the survival of the representations and warranties shall not apply in cases involving fraudulent acts or intentional misrepresentations.

(b)    Survival of Covenants and Agreements.  Each of the covenants and agreements, including the indemnity obligations of the parties contained in, or made by the parties pursuant to the terms of, this Agreement that are to be performed by the parties at or after the Closing shall survive the Closing until the same shall have been performed or discharged in full in accordance with their terms.

Section 9.6    [Intentionally Deleted.]

## ARTICLE X
## MISCELLANEOUS

Section 10.1    Expenses/Taxes.  All legal, accounting, investment banking and other costs and fees incurred by Seller in connection with the transactions contemplated by this Agreement shall be borne and paid for solely by Seller.  All Taxes, including sales and transfer taxes, stamp duties, notarial, registration and recording fees and similar charges resulting from or relating to the transfer of the Transferred Assets to Buyer pursuant to the terms of this Agreement or any other transactions contemplated by this Agreement or the Ancillary Agreements shall be borne and paid for solely by Seller.  All legal, accounting and other costs and fees incurred by Buyer in connection with the transactions contemplated by this Agreement shall be borne and paid for by Buyer.

Section 10.2    Entire Agreement.  This Agreement, together with the Ancillary Agreements and the exhibits and schedules hereto and thereto, constitutes the entire agreement and understanding between the parties hereto in respect of the matters set forth herein, and all prior negotiations, writings and understandings relating to the subject matter of this Agreement are merged herein and are superseded and canceled by this Agreement.

Section 10.3    Amendment and Waiver. This Agreement may be amended, modified, supplemented or changed in whole or in part only by an agreement in writing making specific

- 25 -

reference to this Agreement and executed by each of the parties hereto.  Any of the terms and conditions of this Agreement may be waived in whole or in part, but only by an agreement in writing making specific reference to this Agreement and executed by the party that is entitled to the benefit thereof.  The failure of any party hereto to insist upon strict performance of or compliance with the provisions of this Agreement shall not constitute a waiver of any right of any such party hereunder or prohibit or limit the right of such party to insist upon strict performance or compliance at any other time.

Section 10.4    Binding Agreement and Successors.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

Section 10.5    Assignment.  This Agreement and the rights of the parties hereunder may not be assigned, and the obligations of the parties hereunder may not be delegated, in whole or in part, by any party without the prior written consent of the other parties hereto; provided, however, that Buyer may (a) assign any or all of its rights and interests hereunder to one or more of its Affiliates; and (b) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder).

Section 10.6    No Third Party Beneficiaries.  Nothing in this Agreement is intended to confer any rights or remedies upon any Person other than the parties hereto and the Buyer Group.

Section 10.7    Non-Exclusive Jurisdiction.  Subject to Applicable Law and without limiting either party's right to appeal any order of the Bankruptcy Court, the Bankruptcy Court shall retain non-exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated herein.

Section 10.8    Notices.    Any notice, request, instruction or other document or communication required or permitted to be given under this Agreement shall be in writing and shall be deemed given (a) three (3) days after being deposited in the mail, postage prepaid, certified or registered mail; (b) on the next Business Day after delivery to a reputable overnight delivery service such as Federal Express; or (c) upon personal delivery if delivered or addressed to the addresses set forth below or to such other address as any party may hereafter specify by written notice to the other parties hereto:

| | |
|---|---|
| If to Seller<br>delivered or mailed to: | Littleford Day, Inc.<br>Attention:  Glenn Vice<br>7451 Empire Drive<br>Florence, Kentucky 41042-2985 |
| with a copy delivered or mailed to<br>(which shall not constitute notice): | McGuireWoods, LLP<br>Attention:  Michael Roeschenthaler<br>625 Liberty Avenue, 23rd Floor |

- 26 -

Pittsburgh, Pennsylvania 15222
via email:  MRoeschenthaler@mcguirewoods.com
via facsimile:  412-402-4193

If to Buyer or Guarantor,
delivered via e-mail (required)
and mailed to:

B&P LD Acquisition, LLC
Attention: Mr. Laurence Slovin
1000 Hess Street
Saginaw, MI 48601
via email: lslovin@bpprocess.com
via facsimile:  989-757-1301

with a copy delivered or mailed to
(which shall not constitute notice):

Golenbock Eiseman Assor Bell & Peskoe LLP
Attention:  Robert B. Zimmerman
437 Madison Avenue
New York, New York 10022
via email:  rzimmerman@golenbock.com
via facsimile:  212-754-0330

 

Section 10.9    Further Assurances.  The parties hereto shall execute, make, acknowledge and deliver such instruments, agreements and other documents as may be reasonably required to effectuate the purposes of this Agreement and the Ancillary Agreements and to consummate the Contemplated Transactions.

Section 10.10    Article and Section Headings.  The Article and Section headings contained in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning or interpretation of this Agreement or any of its terms and conditions.   All references to Articles and Sections in this Agreement are to sections and articles of this Agreement unless otherwise indicated.

Section 10.11    Governing Law.   This Agreement shall be construed and enforced in accordance with and shall be governed by the laws of the State of Delaware, without regard to its principles of conflict of laws.

Section 10.12    Construction.

(a)    As used in this Agreement, any reference to the masculine, feminine or neuter gender shall include all genders, the plural shall include the singular, and the singular shall include the plural.  Each and every term and condition of this Agreement and any and all agreements and instruments contemplated hereby have or has been mutually negotiated, prepared and drafted with the advice and participation of counsel to each such party, and that if at any time the parties hereto desire or are required to interpret or construe any such term or condition or any agreement or instrument subject hereto, no consideration shall be given to the issue of which party hereto actually prepared, drafted or requested any term or condition of this

- 27 -

Agreement or any agreement or instrument subject hereto.  The exhibits and schedules to this Agreement constitute a substantive part of this Agreement and are hereby incorporated into this Agreement by this reference.

(b)      The provisions of this Agreement are divisible and separable so that if any provision or provisions hereof shall be held to be unreasonable, unlawful or unenforceable, such holding shall not impair the remaining provisions hereof.  If any provision hereof is held to be unreasonable, unlawful or unenforceable in duration, geographical scope or character of restriction by any court of competent jurisdiction, such provision shall be modified to the extent necessary in order that any such provision or portion thereof shall be legally enforceable to the fullest extent permitted by law, and the parties hereto do hereby expressly authorize any court of competent jurisdiction to enforce any such provision or portion thereof or to modify any such provision or portion thereof in order that any such provision or portion thereof shall be enforced by such court to the fullest extent permitted by Applicable Law.

(c)      In this Agreement, unless a clear contrary intention appears,

(i)      reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually;

(ii)      reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof;

(iii)      "hereunder," "hereof," "hereto," and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision hereof;

(iv)      "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

(v)      "or" is used in the alternative sense and the inclusive sense of "and/or";

(vi)      with respect to the determination of any period of time, "from" means "from and including" and "to" means "to and including"; and

(vii)      references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto.

Section 10.13 Counterparts and Electronic Delivery.  This Agreement may be executed in counterparts and multiple originals and by facsimile, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile or electronic transmission ("Electronic Delivery") shall constitute effective execution and delivery of this Agreement as to the parties, shall be treated as an original agreement and signature pages thereof

- 28 -

for all purposes, and shall be deemed to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto shall raise the use of such Electronic Delivery to deliver a signature, or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery, as a defense to the formation of a contract and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

      Section 10.14  Waiver of Jury Trial.  EACH OF THE PARTIES WAIVES ITS RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OR RELATED TO THIS AGREEMENT IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY AFFILIATE OF ANY OTHER SUCH PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE. THE PARTIES AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY.   WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

*[Signatures on the following page]*

2293924.3

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement as of the day and year first above written.

B&P LD ACQUISITION, LLC

By: _____
Name: Ted S. Levy
Title: President

B&P PROCESS EQUIPMENT & SYSTEMS, LLC

By: _____
Name: Laurence S. Slovin
Title: President and CEO

LITTLEFORD DAY, INC.

By: _____
Name: Glenn Vice
Title: Interim CEO

*Signature Page – Asset Purchase Agreement*

## EXHIBIT A

## DEFINITIONS

The following terms, whenever used in capitalized form in this Agreement, shall have the following meanings:

"Affiliate" shall mean any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  For purposes of determining whether a Person is an Affiliate, the term "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of securities, contract or otherwise.

"Ancillary Agreements" shall mean the Bill of Sale and Assignment Agreement, the Escrow Agreement, and all other agreements executed in connection with this Agreement or the transactions contemplated hereby or by any other Ancillary Agreement.

"Applicable Laws" shall mean any law, statute, ordinance, code, rule, regulation, standard, ruling, decree, judgment, award, order or other requirement of any Governmental Authority that is applicable to the Business or the properties, assets or rights of Seller (including the Transferred Assets).

"Auction" shall have the meaning specified in the Bidding Procedures.

"Bankruptcy Code" means chapter 11 of title 11 of the United States Code.

"Bankruptcy Court" means the United Stated Bankruptcy Court for the District of Delaware.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

"Bidding Procedures" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, attached hereto as Exhibit D.

"Bidding Procedures Order" means the order of the Bankruptcy Court, attached hereto as Exhibit E, approving the Bidding Procedures.

"Bulk Sales Laws" shall mean the bulk-transfer provisions of the Uniform Commercial Code (or any similar law).

"Business" has the meaning set forth in the Recitals.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which commercial banks in the State of Delaware are authorized to close.

2293924.3

"Buyer Group" shall mean Buyer and its Affiliates, employees, officers, directors, managers, stockholders, members, agents and Representatives.

"Closing" shall mean the consummation of the transactions contemplated by this Agreement.

"Closing Date" shall mean the date on which the Closing actually shall occur pursuant to this Agreement.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Contemplated Transactions" means all transactions contemplated by this Agreement or any of the Ancillary Agreements.

"Contract" shall mean any agreement, contract, consensual obligation, promise or undertaking (whether written or oral and whether express or implied), whether or not legally binding.

"Copyrights" shall have the meaning set forth in Section 2.16(e).

"Disclosure Schedules" has the meaning set forth in the opening paragraph of Article II.

"Employee Plan" shall mean each "employee benefit plans" as defined by Section 3(3) of ERISA, all specified fringe benefit plans as defined in Section 6039D of the Code, and all other bonus, incentive-compensation, deferred-compensation, profit-sharing, stock-option, stock-appreciation-right, stock-bonus, stock-purchase, employee-stock-ownership, savings, severance, change-in-control, supplemental-unemployment, layoff, salary-continuation, retirement, pension, health, life-insurance, disability, accident, group-insurance, vacation, holiday, sick-leave, fringe-benefit or welfare plan, and any other employee compensation or benefit plan, agreement, policy, practice, commitment, contract or understanding (whether qualified or nonqualified, currently effective or terminated, written or unwritten) and any trust, escrow or other agreement related thereto that (i) is maintained or contributed to by Seller or any other corporation or trade or business controlled by, controlling or under common control with Seller (within the meaning of Section 414 of the Code or Section 4001(a)(14) or 4001(b) of ERISA) ("ERISA Affiliate") or has been maintained or contributed to in the last six (6) years by Seller or any ERISA Affiliate, or with respect to which Seller or any ERISA Affiliate has or may have any liability, and (ii) provides benefits, or describes policies or procedures applicable to any current or former director, officer, employee or service provider of Seller or any ERISA Affiliate, or the dependents of any thereof, regardless of how (or whether) liabilities for the provision of benefits are accrued or assets are acquired or dedicated with respect to the funding thereof.

"Employees" shall mean all current employees, former employees and retired employees of Seller with respect to the Business as of the day immediately prior to the Closing Date or for a one (1) year period thereafter.

"Encumbrance" shall mean any interest of any Person, including any right to acquire, option, right of preemption, or any mortgage, lease, charge, pledge, lien, encumbrance,

Exhibit A-2

assignment, hypothecation, security interest, title retention, claim, covenant, condition, easement or any other security agreement or arrangement or any restriction of any kind or character.

"Environment" means soil, land surface or subsurface strata, surface waters (including navigable waters and ocean waters), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life and any other environmental medium or natural resource.

"Environmental, Health and Safety Liabilities" means any cost, damages, expense, liability, obligation or other responsibility arising from or under any Environmental Law or Occupational Safety and Health Law, including those consisting of or relating to:

(a)     any environmental, health or safety matter or condition (including on-site or off-site contamination, occupational safety and health and regulation of any chemical substance or product);

(b)     any fine, penalty, judgment, award, settlement, legal or administrative proceeding, damages, loss, claim, demand or response, remedial or inspection cost or expense arising under any Environmental Law or Occupational Safety and Health Law;

(c)     financial responsibility under any Environmental Law or Occupational Safety and Health Law for cleanup costs or corrective action, including any cleanup, removal, containment or other remediation or response actions ("Cleanup") required by any Environmental Law or Occupational Safety and Health Law (whether or not such Cleanup has been required or requested by any Governmental Body or any other Person) and for any natural resource damages; or

(d)     any other compliance, corrective or remedial measure required under any Environmental Law or Occupational Safety and Health Law.

The terms "removal," "remedial" and "response action" include the types of activities covered by the United States Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA).

"Environmental Law" means any Applicable Law that requires or relates to:

(a)     advising appropriate authorities, employees or the public of intended or actual Releases of pollutants or hazardous substances or materials, violations of discharge limits or other prohibitions and the commencement of activities, such as resource extraction or construction, that could have significant impact on the Environment;

(b)     preventing or reducing to acceptable levels the Release of pollutants or hazardous substances or materials into the Environment;

(c)     reducing the quantities, preventing the Release or minimizing the hazardous characteristics of wastes that are generated;

(d)      assuring that products are designed, formulated, packaged and used so that they do not present unreasonable risks to human health or the Environment when used or disposed of;

(e)      protecting resources, species or ecological amenities;

(f)      reducing to acceptable levels the risks inherent in the transportation of hazardous substances, pollutants, oil or other potentially harmful substances;

(g)      cleaning up pollutants that have been Released, preventing the Threat of Release or paying the costs of such clean up or prevention; or

(h)      making responsible parties pay private parties, or groups of them, for damages done to their health or the Environment or permitting self-appointed representatives of the public interest to recover for injuries done to public assets.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean any Person that is treated as a single employer with the Person in question under Section 414(b), (c), (m) or (o) of the Code.

"Escrow Agent" shall mean Chicago Title Insurance Company.

"Escrow Agreement" shall have the meaning set forth in Section 1.6(b).

"Facilities" means any real property, leasehold or other interest in real property currently owned or operated by Seller, including the Tangible Personal Property used or operated by Seller at the respective locations of the Leased Real Property. Notwithstanding the foregoing, for purposes of the definitions of "Hazardous Activity" and "Remedial Action" and Sections 2.22 and 9.2, "Facilities" shall mean any real property, leasehold or other interest in real property currently or formerly owned or operated by Seller, including the Tangible Personal Property used or operated by Seller at the respective locations of the Leased Real Property.

"GAAP" shall mean generally accepted accounting principles in effect in the United States as of the date of this Agreement.

"Governmental Authority" shall mean any federal, state or local government (or any subdivision thereof), whether domestic, foreign or multinational, or any agency, authority, bureau, commission, department or similar body or instrumentality thereof, or any governmental court or tribunal.

"Hazardous Activity" means the distribution, generation, handling, importing, management, manufacturing, processing, production, refinement, Release, storage, transfer, transportation, treatment or use (including any withdrawal or other use of groundwater) of Hazardous Material in, on, under, about or from any of the Facilities or any part thereof into the Environment and any other act, business, operation or thing that increases the danger, or risk of danger, or poses an unreasonable risk of harm, to persons or property on or off the Facilities.

"Hazardous Material" means any substance, material or waste which is or will foreseeably be regulated by any Governmental Authority, including any material, substance or waste which is defined as a "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "contaminant," "toxic waste" or "toxic substance" under any provision of Environmental Law, and including petroleum, petroleum products, asbestos, presumed asbestos-containing material or asbestos-containing material, urea formaldehyde and polychlorinated biphenyls.

"Income Taxes" shall mean any income, gross receipts, gains, net worth, surplus, franchise or withholding taxes (including interest, penalties or other additions to Tax) imposed by a Tax Authority.

"Indebtedness" shall mean without duplication (in each case whether such obligation is with full or limited recourse) (i) any and all obligations of Seller for borrowed money; (ii) obligations of Seller in respect of the deferred purchase price for any real or personal property or services; (iii) any and all obligations of Seller in respect of any capital lease; (iv) any and all amounts in respect of which Seller may be liable, contingently or otherwise, under any guarantees of Indebtedness of another Person; and (v) any other items required to be reported as short-term or long-term debt on the balance sheets of Seller in accordance with GAAP.

"Intellectual Property" shall have the meaning set forth in Section 2.16(g).

"Inventory" shall mean all products, parts, supplies, materials and other inventories of raw materials, works-in-progress and finished goods owned by Seller (wherever located) to the extent used in or held for use in the Business, including inventories on consignment and any inventories located in warehouses or similar facilities.

"IRS" shall mean the Internal Revenue Service of the United States of America.

"Knowledge" means, an individual will be deemed to have Knowledge of a particular fact or other matter if:

(a)     that individual is actually aware of that fact or matter; or

(b)     a prudent individual would be expected to discover or otherwise become aware of that fact or matter in the course of conducting a reasonably comprehensive investigation regarding the accuracy of the representations and warranties contained in this Agreement.

Seller will be deemed to have Knowledge of a particular fact or other matter if any individual who is currently serving, or who has at any time within the last year served, as a director or executive officer of Seller has Knowledge of that fact or other matter (as set forth in (a) and (b) above).

"Leased Real Property" shall mean all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property held by Seller for use in the Business, whether or not listed on Schedule 2.10.

2293924.3

"Leases" shall have the meaning set forth in Section 2.10.

"Liabilities" shall mean any direct or indirect liability, indebtedness, guaranty, endorsement, claim, loss, damage, judgment, deficiency, cost, expense, assessment, fee, interest payment, penalty, disbursement, obligation or responsibility, including, without limitation all reasonable professional fees and attorneys' fees and expenses associated therewith, whether known or unknown, asserted or unasserted, due or to become due, obsolete, accrued, absolute, liquidated or unliquidated, contingent or fixed, consequential or special, secured or unsecured, determined or undeterminable.

"Lien" has the meaning specified in Section 101 (37) of the Bankruptcy Code and shall include any claim, lien, pledge, option, charge, hypothecation, security interest, right-of-way encroachment, mortgage, deed of trust, defect of title, restriction on transferability, restriction on use or other encumbrance, in each case whether enforced by agreement, law, equity or otherwise. For avoidance of default, "Lien" shall not include any license (or sublicense) or Intellectual Property.

"Losses" means any and all losses, costs, claims, damages, penalties, interest and expenses (including reasonable attorneys' fees and expenses and reasonable costs of investigation and litigation but excluding lost profits and consequential damages).

"Material Adverse Effect" shall mean with respect to Seller, a material adverse effect on the Transferred Assets, Leased Real Property, rights, business and operations, taken as a whole; provided that the term "Material Adverse Effect" does not include the effect of any circumstance, change, development, event, or state of facts arising out of the following: (i) general business or economic conditions other than such conditions that disproportionately impact the business, financial condition, prospects, assets, liabilities, operations or results of operations of the Seller, taken as a whole; or (ii) acts of war (whether or not declared), sabotage or terrorism, military actions or the escalation thereof, or other force majeure events occurring after the date hereof.

"Multiemployer Plan" shall mean a plan described in Sections 3(37) and 4001(a)(3) of ERISA to which Seller has an obligation to contribute.

"Ordinary Course of Business" shall mean an action taken by a Person will be deemed to have been taken in the Ordinary Course of Business only if that action:

(a)     is consistent in nature, scope and magnitude with the past practices of such Person and is taken in the ordinary course of the normal, day-to-day operations of such Person;

(b)     does not require authorization by the board of directors or shareholders of such Person (or by any Person or group of Persons exercising similar authority) and does not require any other separate or special authorization of any nature; and

(c)     is similar in nature, scope and magnitude to actions customarily taken, without any separate or special authorization, in the ordinary course of the normal, day-to-

day operations of other Persons that are in the same line of business as such Person.

"Patents" shall have the meaning set forth in Section 2.16(g).

"Permitted Encumbrances" means (i) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Transferred Assets which do not, individually or in the aggregate, materially adversely affect the operation of the Business and, in the case of the Leased Real Property, which do not, individually or in the aggregate, materially adversely affect the use or occupancy of such Leased Real Property as it relates to the operation of the Division or materially detract from the value of the Leased Real Property, (ii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law), (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business for sums not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Case and that do not result from a breach, default or violation by a Seller of any Contract or Law, (iv), Encumbrances reflected in title or other public records relating to, or that would be disclosed by an accurate survey of, the Leased Real Property (including such easements and other rights to use the surface of any Leased Real Property as set forth in deeds or leases of coal, oil, gas, or other mineral interests of record in the recording office where the Leased Real Property is located), (v) such other Encumbrance, title exceptions or imperfections of title as Buyer may approve in writing in its sole discretion or which do not, individually or in the aggregate, materially adversely affect the value or the intended use of the Transferred Assets taken as a whole and (vi) any Liabilities created by this Agreement, the DIP Loan or any of the Ancillary Agreements.

"Person" shall mean any individual, corporation, unincorporated association, business trust, estate, partnership, limited liability company, limited liability partnership, trust or Governmental Authority.

"Proceeding" shall mean any suit, claim, proceeding, action at law or in equity, hearing, investigation, charge, complaint, audit, notice or demand.

"Release of Transferred Assets" shall mean the release of all Encumbrances that any of the Transferred Assets were subject to prior to the Closing Date to include the agreement of any lienholder or lender to file, or to authorize the Seller to file, any UCC-3 termination statements or such other documentation necessary to effectuate the release of such Encumbrances on the Transferred Assets.

"Release" shall mean any release, spill, emission, leaking, pumping, pouring, dumping, emptying, injection, deposit, disposal, discharge, dispersal, leaching or migration on or into the Environment or into or out of any property.

"Remedial Action" shall mean all actions, including any capital expenditures, required or voluntarily undertaken (a) to clean up, remove, treat or in any other way address any Hazardous Material or other substance; (b) to prevent the Release or Threat of Release or to minimize the further Release of any Hazardous Material or other substance so it does not migrate or endanger

2293924.3

or threaten to endanger public health or welfare or the Environment; (c) to perform pre-remedial studies and investigations or post-remedial monitoring and care; or (d) to bring all Facilities and the operations conducted thereon into compliance with Environmental Laws and environmental Governmental Authorizations.

"Representative" means with respect to a particular Person, any director, officer, manager, employee, agent, consultant, advisor, accountant, financial advisor, legal counsel or other representative of that Person.

"Sale Motion" shall mean the Motion file with the Bankruptcy Court seeking entry of the Bidding Procedures Order and the Sale Order.

"Sale Order" means on Order of the Bankruptcy Court, (a) in a form and substance reasonably acceptable to Buyer (including the provisions contemplated by Section 4.5(e)) substantially in the form attached hereto as Exhibit F, (b) approving without limitation, this Agreement and all of the terms and conditions hereof, (c) authorizing the Seller to consummate the transactions contemplated hereby pursuant to Section 363 of the Bankruptcy Code and (d) providing for the sale of the Transferred Assets free and clear of all Encumbrances.

"Seller Contract" shall mean any Contract (a) under which Seller has or may acquire any rights or benefits; (b) under which Seller has or may become subject to any obligation or liability; or (c) by which Seller or any of the assets owned or used by Seller is or may become bound.

"Seller Group" shall mean Seller and its Affiliates, employees, officers, directors, managers, stockholders, members, agents and Representatives.

"Seller Intellectual Property" shall have the meaning set forth in Section 2.16(f).

"Seller Receivable" shall mean the full amount of all indebtedness of Seller owed to Buyer or Buyer's Affiliates as of the Closing Date including all amounts owed in connection with royalties, the purchase of Inventory, trade payables, or other sums due and owing.

"Tax Authority" shall mean a foreign or United States federal, state or local Governmental Authority having jurisdiction over the assessment, determination, collection or imposition of any Tax, as the context requires.

"Tax Returns" shall mean all returns (including information returns and amended returns), declarations, reports, claims for refunds, estimates and statements regarding Taxes, required to be filed under Applicable Laws.

"Taxes" shall mean all taxes, charges, fees, levies or other assessments, including all net income, gross income, gross receipts, sales, use, value added, ad valorem, transfer, franchise, profits, license, withholding, payroll, employment, windfall profit, alternative or add on minimum, excise, estimated, severance, stamp, occupation, property or other taxes, customs, duties, fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Tax Authority.

"<u>Trademarks</u>" shall have the meaning set forth in Section 2.16(g).

"<u>Trade Secrets</u>" shall have the meaning set forth in Section 2.16(g).

"<u>Transferred Assets</u>" shall have the meaning set forth in Section 1.1.